HENRY GEORGE SCARBOROUGH *v*. STATE OF MARYLAND

[No. 113, September Term, 1967.]

*Decided February 19, 1968.*

The cause was argued before MURPHY, C. J., and ANDER-
SON, MORTON, ORTH, and THOMPSON, JJ.

*Alan H. Murrell* for appellant.

*William E. Brannan, Assistant Attorney General,* with whom
were *Francis B. Burch, Attorney General, Charles E. Moylan,
Jr., State's Attorney for Baltimore City,* and *Bernard J. Dis-*

*chinger, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was charged in indictment No. 1258 with the sale of a lottery ticket (1st count), the keeping of a room at 514 N. Patterson Park Avenue for the purpose of selling lottery tickets (2nd count), permitting the room, of which he was the owner, to be used as a place for selling lottery tickets (3rd count) and possession of lottery slips (4th count). There was an addendum to that indictment warning the appellant that the State had evidence that he had been convicted formerly of violation of the lottery laws and intended to prosecute him for the current offense as a subsequent offender. See Maryland Rules, 713. He was also charged jointly with Emma Elizabeth Scarborough, in indictment No. 1126, containing sixteen counts, with bookmaking and related offenses. The appellant went to trial without a jury in the Criminal Court of Baltimore on both indictments, and, by his election, the issue of whether or not he was a subsequent offender was tried concurrently with indictment No. 1258. He was found guilty under indictment No. 1126 on the 9th count (using the house at 514 N. Patterson Park Avenue for the purpose of betting on the result of a race), and on the 10th count (using the house for the purpose of making books and pools upon the result of a race)[1] and guilty generally under indictment No. 1258. He was sentenced to imprisonment for a term of 3 years upon the convictions under indictment No. 1258 as being a second time convicted of an

---

[1] It appears from the briefs of the appellant and the appellee that each assumed there was a verdict of guilty on the third count of indictment No. 1126. The record indicates that the trial court at first so stated. This gave rise to a discussion participated in by the court, the Assistant State's Attorney and counsel for the appellant, at the conclusion of which the court said, "Well, I suppose the State is pressing nine and ten." Receiving an affirmative answer from the State, the court said, "All right, the verdict is guilty on the ninth and tenth counts." Entries on the original indictment and the docket show the verdict as guilty on the 9th and 10th counts. We think it clear that the court found the appellant guilty only on the 9th and 10th counts.

offense relating to lotteries, Md. Code, (1967 Repl. Vol.), Art. 27, § 366, and for a term of 1 year upon the convictions under indictment No. 1126, to run concurrently with the 3 year sentence.

On appeal he contends that:

I The search warrant was invalid;

II The evidence was not sufficient to sustain the convictions.[2]

I

The application for the search warrant, properly signed and sworn to by Lawrence A. Banks, a "Patrolman of Police of Baltimore City" before a judge of the Supreme Bench of Baltimore City contained alleged facts within the personal knowledge of the affiant from which it clearly appeared that there was probable cause for the issuance of the search warrant. See Md. Code, *supra,* Art. 27, § 551. The appellant urges, however, that the facts alleged were actually not facts but fiction, that the allegations of the affiant were false because he did not observe what he swore he observed and that since the basis of the probable cause was "false and fictitious statements" the warrant was invalid.

It has been firmly established in this State that "the court's consideration of the showing of probable cause should be confined solely to the affidavit itself." In *Smith v. State,* 191 Md. 329, 335, cert. den. 336 U. S. 925, the Court said:

> "The better rule seems to be that the court's consideration of the showing of probable cause should be confined solely to the affidavit itself, and the truth of the alleged grounds stated in the affidavit cannot be controverted, as was done in the instant cases, by re-

---

2. As the appellee's brief points out, the question presented on the sufficiency of the evidence in the appellant's brief goes only to indictment No. 1258. However, the argument on the question includes the convictions under indictment No. 1126. The appellant does not contend that he had not been convicted formerly of a lottery offense. Indictment No. 3164 of the docket of 1964, showing that the appellant was found guilty of such an offense, was admitted in evidence without objection.

ceiving the testimony of the accused and other witnesses. * * * We are of opinion that any inquiry as to whether the affidavit, on which the search warrant was based, showed probable cause is confined to the affidavit alone and testimony should not be taken to controvert the truth of the allegations therein."

In *Tucker v. State*, 244 Md. 488, it was urged by the appellant, as in substance the appellant here urges, that however "legally sound, well intentioned and theoretically perfect" *Smith* may be, it has become, "an instrument of oppression and a vehicle of perjury" and that the Court ought to "re-examine" the holding "in light of developments in the field of constitutional law" since it was decided in 1948. In answer, after examination of the cases cited by Tucker in support of his views, the Court quoted *Tischler v. State*, 206 Md. 386, 390-391:

"Appellant urged that we should abrogate this rule because it encourages police officers to make false statements under oath. But the rule which was adopted by this Court in 1948 was reaffirmed in 1951 in *Goss v. State*, 198 Md. 350, 354, 84 A. 2d 57; again in 1952 in *Adams v. State*, 200 Md. 133, 139, 88 A. 2d 556; and again in 1953 in *Harris v. State*, 203 Md. 165, 172, 99 A. 2d 725. Accordingly we again assert that the rule is so firmly established in Maryland that it should not be changed by a decision of this Court. We also take occasion to say that this rule has been generally followed in other States. [Citing cases.]"

The above language from *Tischler* was also quoted in *Burrell v. State*, 207 Md. 278, 280, the Court saying: "We are not persuaded that the earlier cases were wrongly decided." The Court of Appeals was not so persuaded in *Tucker* and this Court is not now so persuaded. See *Clayton v. State*, 1 Md. App. 500.

In any event, however, we do not agree that the evidence before the court in the instant case "clearly established the falsity of Bank's sworn allegations in the application for the search

warrant." In the application for the search warrant, Banks, assigned to the Rackets Division of the Baltimore City Police Department, stated that on February 21, 1966 about 10:30 A. M. he went to the 500 block of North Patterson Park Avenue to watch for violations of the lottery and bookmaking laws, paying particular attention to Emma's Cafe at 514 North Patterson Park Avenue. He saw two men enter the Cafe and leave after staying a short time. About 11:05 A. M. he entered the Cafe, immediately preceded by a man designated in the application as the First Man. The First Man engaged in a conversation with a woman and Banks heard him say, "Here's the numbers I got," and handed her some slips of white paper and money. The First Man said, "Where's Hennie, I got some horse bets for him." The woman called, "Hennie," and a man designated in the application as the Second Man came "from what appeared to be a back room" and met the First Man at the end of the bar. Banks saw the First Man give the Second Man some small slips of white paper and money. Banks left the Cafe at 11:15 A. M. Banks was again in the vicinity of the Cafe on February 22, 1966 from 10:40 A. M. to 11:40 A. M. and although he did not enter the premises, observed activities by the First Man and others indicating that violations of the lottery and gambling laws were being conducted therein. He went back again on February 23, 1966 remaining from 11:05 A. M. to 11:20 A. M. He did not enter the Cafe but through a window of the Cafe saw the woman he had observed on February 21st and the First Man talking to each other. The appellant's allegation that the statements in the application were false is predicated on the testimony of Albert Sharpe, a plainclothes officer assigned to the Eastern District of the Baltimore City Police Department, called as a witness for the State. Sharpe was in the Cafe on February 24, 1966, at the time it was raided by the Rackets Division. He had been detailed to Emma's Cafe for about two weeks to investigate gambling activities. Neither the Rackets Division nor the Eastern District knew that the other had the Cafe under surveillance. It developed on cross-examination that Sharpe had been in the Cafe on February 21st and February 23rd, two of the days covered in the application. Sharpe said he arrived at the Cafe on Feb-

ruary 21st between 10:30 to 11:00 A. M. and was in the place "no more than a half hour, and no less than fifteen minutes." On February 23rd he entered the Cafe around 11:00 A. M. and stayed "about a half hour." On neither of these occasions did he observe any gambling activities on the premises and specifically did not see the appellant "at any time engage in any gambling activities of any sort." The pay telephone rang while he was there and it was answered at times by the appellant and at times by the barmaid. He knew Officer Banks by sight but did not see him in the tavern or in its vicinity on February 21st. However, he sat in the back room because he could see "that phone from there" but "you can't see out front." We do not agree that this testimony, even if relevant for the purpose, "clearly established the falsity" of the statements in the application. It appeared from the evidence that the bar was located in the front room of the premises. There was a back room connected to the front room by a small hallway on a wall of which was a "public telephone." Behind the back room was a storage room and rest rooms. Bank's observations were made while he was outside the tavern and in the front room of the tavern, but Sharpe was in the back room unable to see into the front room. The appellant also attacks the credibility of Banks because of the events during the raid on February 24th. Banks testified that when the police entered the Cafe he and another officer, Marley, on orders of the sergeant, went to the back of the premises. Marley went directly through the back room toward the storage room. When Banks, following Marley, reached the back room he saw the appellant sitting at a table with a piece of paper in his hand. "He was putting it towards his mouth." Banks yelled, "He is trying to get it in his mouth." There was a struggle, during which Marley rendered assistance, but the appellant succeeded in swallowing the paper. On cross-examination Banks said that another man was seated at the table with the appellant when he entered the room. The other man seated at the table was Officer Sharpe. The appellant urges that the testimony of Banks was not credible because of the testimony of Marley, an Officer Zotos, who participated in the raid, and Sharpe, concluding that if Bank's testimony in court was not credible, the statements in the application were not

credible. Marley testified that he went "straight through the back room" to check the rest rooms and heard the affiant "holler" that the appellant was trying to swallow a slip. He joined the struggle but "didn't get anything." On cross-examination he said that when he entered the back room he saw two people sitting at a table but he "was running through", and did not pay any attention to them at that time. Zotos testified that when they entered the Cafe he remained in the front room with the sergeant. They "heard voices from the back" and the sergeant told him to go see what was wrong. When he arrived in the back room he saw Banks and Marley struggling with the appellant. Sharpe testified that he was in the back room seated at a table with the appellant when the raid occurred. He saw the officers come in the room, got up from the chair and turned to look out front. He heard someone say something like, "He is putting them in his mouth" and when he turned around again "both officers had" the appellant. On cross-examination in answer to a question, "Well, did you see anything at all to indicate he was putting something in his mouth, or near his mouth?", he replied, "I could not look, I couldn't get a look at him because both of them had their backs to me and Mr. Scarborough, I couldn't even see him." We see no material inconsistency in the testimony of the affiant and the other officers as to impugn the credibility of the affiant and cannot reach the conclusion of the appellant.

We point out that "It is, of course, beyond question that if an applicant for a search warrant wilfully makes a false statement in his affidavit, he can be prosecuted under the Perjury Act." *Tischler v. State,* 206 Md. 386, 391-392. While, as the appellant here suggests, it may be of little solace to a defendant to share confinement with a person whose false statements resulted in the incarceration of both of them, we are not constrained to abrogate the rule confining the showing of probable cause solely to the affidavit itself by departing from the decisions of the Court of Appeals and this Court in which the rule is so clearly established and followed. The appellant attempts to distinguish his case from other decisions on the matter on the ground that the evidence he alleges controverted the truth of the statements in the application was not offered by

him but was by the testimony of witnesses produced by the State, coming into the case without objection by the State on cross-examination of them. We think it clear under the rule that "any inquiry as to whether the affidavit, on which the search warrant was based, showed probable cause is confined to the affidavit alone," and, therefore, evidence outside the affidavit, no matter by whom produced or how, is not relevant to the inquiry. We find no error in the denial of the motions "to quash the search and seizure warrant and the application" and "to strike and exclude all evidence."

## II

"For this Court to reverse a judgment entered in a case tried by the lower court without a jury, it must be shown that there was no legally sufficient evidence, or proper inferences therefrom, from which the court could find the accused guilty beyond a reasonable doubt." *Crum and Dunbar v. State,* 1 Md. App. 132, 135, quoting *McCray v. State,* 236 Md. 9, 15. In the search made under the authority of the warrant the police found a "non-conventional lottery slip, containing 232 numbers, indicating $108 in play," behind the bar in the front room of the Cafe "right opposite where Mrs. Emma Scarborough was seated." From between the leaves of a Sears Roebuck catalogue under the bar, "about almost half way of the bar," they recovered "two pay-off slips," lottery and bookmaking pay-off slips containing "79 individual names, indicating $1,684.25 owed." About five minutes after the police entered, the public telephone in the hallway between the front and back rooms rang and was answered by the sergeant. The caller, identified as a male by his voice, said he was Sonny (the name Sonny was one of those on the pay-off slip) and asked to speak to "Henny." The sergeant said he was Henny and Sonny said, "I want three $4.00 doubles at Pimlico, three and five, five and five, four and two, $12, right." The sergeant replied, "Okay." Ten minutes later the telephone rang again. The sergeant answered it, identifying himself as Henny. The male voice said, "This is Gus from Maryland. I want 179 for $4 combination; and 314 for $4 combination." The sergeant replied, "Okay." The sergeant said there were several other calls requesting to speak to Henny but when he identified himself as Henny they hung up. Officer

Marley also answered the telephone. The caller, who said he was Ed, asked for Hen. The officer indicated he was Hen and Ed gave the officer a "horse" bet, "Eight up in the first, to nothing certain the second, and two double." Three or four other times the telephone rang and the callers asked for Hen but hung up when the officer said he was Hen. The beer and wine license for Emma's Cafe was in the name of Emma Scarborough, 519 North Patterson Park Avenue. There was no evidence as to ownership of the building, whether or not the appellant lived on the premises, whether or not he had any proprietary interest in the business or was an employee of the licensee (it may be inferred from the record that Emma Scarborough and the appellant were man and wife and the appellant's brief so states).

We think it a proper inference from the telephone calls that the appellant was at least one of those to whom the money was owed as shown by the lottery and bookmaking pay-off slips recovered. The callers asked for Henny or Hen and one of them identified himself as Sonny, a name appearing on the pay-off slips. On the evidence of the telephone calls, the pay-off slips, the actions of the appellant in swallowing a white slip of paper despite the unsuccessful attempts of the police to dissuade him,[3] his presence at the time of the raid, his presence during the times Officer Sharpe was in the back room of the Cafe on days preceding the raid (Sharpe testified, "The telephone rang on occasions that I have been in there [the Cafe] * * * Mr. Henry Scarborough has answered the phone [and] the barmaid has answered it"), and the time of day he was on the premises [4]—on all this evidence and proper inferences there-

3. It has been recognized that flight from the police may be evidence of guilt under proper circumstances. *Robinson v. State*, 229 Md. 503; *Salmon v. State*, 2 Md. App. 513. By analogy, we think the swallowing of the paper by the appellant, under the circumstances, could reasonably be viewed as evidence of guilt of the crimes charged in the 9th and 10th counts of indictment No. 1126 and the 1st and 2nd counts of indictment No. 1258 even though there was no evidence as to what was on the slip.

4. The sergeant in charge of the raid, knowledgeable in the methods of operation of illegal lottery and gambling activities, testified in response to a question from defense counsel as to why he told

from—we think that the trial court could find the appellant guilty beyond a reasonable doubt of using a portion of the building at 514 North Patterson Park Avenue for the purpose of betting and making book upon the result of a race (9th and 10th counts of indictment No. 1126), of selling a lottery ticket and of keeping a room at 514 North Patterson Park Avenue for the purpose of selling lottery tickets (1st and 2nd counts of indictment No. 1258). We feel, however, that the trial court did not have sufficient evidence from which it could fairly be convinced beyond a reasonable doubt that the appellant was guilty of knowingly permitting a room located at 514 North Patterson Park Avenue, *of which he was the owner,* to be used as a place for selling lottery tickets or of possession of lists, slips and records of money received or to have been received from the sale of lottery tickets (3rd and 4th counts of indictment No. 1258). The record is silent as to proof of ownership of the building, as to who were the lessees of the premises, and as to whether the appellant lived there, showing only that Emma Scarborough was the licensee under the beer and wine license. Both the lottery slip and the pay-off slips were found in the front room—the lottery slip behind the bar "right opposite where Mrs. Emma Scarborough was seated" and the pay-off slips under the bar. Nothing was found on the person of the appellant or in his immediate presence. Although under proper circumstances such slips may be held to be in the joint possession of two or more persons (see *Rucker v. State,* 196 Md. 334), we do not think that the evidence here is sufficient to prove the appellant was in possession of them as charged. Com-

---

Officers Banks and Marley to go into the back rooms: "I have been around so much I know what is going on in that I know Emma is in the business, and also Henry, and know Henry stays in that back room. I know that. So, I instructed those two to go immediately to that back room. I knew Henry would be back there before 1:00 o'clock. I even know, knew the time, that he had to hit it before 1:00, I even knew that when I went in there, and know Emma sits at the front, and sits at the front and watches the front and see who comes up and down the street, and knew where Emma would be, and she was right where I said she would be. And that is why I gave those instructions."

pare *Salmon v. State, supra.* We must reverse the judgments on the 3rd and 4th counts of indictment No. 1258.

The sentence as a subsequent offender on the general verdict of guilty on indictment No. 1258 was within the maximum prescribed by Md. Code, *supra,* Art. 27, § 366 and is not invalidated by our reversal of the judgments on the third and fourth counts of that indictment. See *Tender, etc. v. State,* 2 Md. App. 692.

> *As to Indictment No. 1126:*
> *judgments on the ninth and tenth counts affirmed.*
> *As to Indictment No. 1258:*
> *judgments on the first and second counts affirmed; judgments on the third and fourth counts reversed.*
> *Appellant to pay costs.*