JAMES WILLIAMS AND LEROY WILLIAMS *v.*
STATE OF MARYLAND

[No. 344, September Term, 1968.]

*Decided May 6, 1969.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Julian L. Lapides* and *Milton B. Allen* for appellants.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City, George J. Helinski, Deputy State's Attorney for Baltimore City,* and *Robert C. Stewart, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

James Williams and Leroy Williams, the appellants, and William Edward Ward were jointly indicted, charged with, 1st count: selling a lottery ticket (Md. Code, Art. 27, § 356) ; 2nd count: keeping a certain place, "to wit, a room located at 2243-2245 Prentiss Place for the purpose of selling lottery tickets" (§ 360) ; 3rd count: knowingly permitting a certain room located at the same address "of which they were the owners" to be used as a place for selling lottery tickets (§ 361) ; and 4th count: possession of lottery slips (§ 362). The appellants were jointly tried at a court trial in the Criminal Court of Baltimore, each was found guilty under the 3rd and 4th counts and each was sentenced generally to one year under the jurisdiction of the Department of Correctional Services and fined $1000 and costs. As to James Williams the prison sentence and fine were consecutive. As to Leroy Williams the prison sentence was suspended upon payment of fine and costs.[1] The questions presented on appeal go to the sufficiency of the evidence, each appellant claiming that the evidence did not prove the charges of which he was convicted.

## THE FACTS

Upon application of Officer Edward Wisniewski of the Baltimore City Police Department, Vice Section, conceded by the defense to be an expert on lottery operations, a

---

1. On the date of the trial of the appellants the bail of Ward was ordered forfeited. The forfeiture was subsequently "stricken out", and bail was continued. Shortly thereafter Ward was tried at a court trial and found not guilty.

search and seizure warrant was issued. The warrant commanded any police officer of Baltimore City to search the "premises 2243-45 Prentiss Place (a tavern known as Lucky Tavern) ; a "colored male 45-50 years, 5' 10", 165 lbs., wearing glasses" and "a 1960 blue and white Chevrolet Station Wagon bearing Maryland license EX4855 (old issue) ; to seize lottery slips and related gambling paraphernalia found; and, upon execution of the warrant, to arrest persons found "then and there engaged in the commission of a crime." The warrant was admitted in evidence without objection, its validity being expressly conceded. Wisniewski testified that he and two other officers executed the warrant on 12 March 1968 about 2:00 p.m., displaying it to the barmaid, Eunice Bernice Lassiter, and searched the premises. Seven "non-conventional lottery slips showing 190 numbers and $58.35 in play" were found in a towel dispenser in the kitchen on the first floor. On a porch "right outside the kitchen" thirteen lottery slips were found underneath a steel grate and twenty-six slips, showing 866 numbers for $312.75 in play underneath a television cabinet. In the rear yard two slips containing fifty numbers for $12.05 in play were found in a trash can. The slips were admitted in evidence without objection. The police determined that the licensees were not on the premises. The State did not produce the license, stating that the defense had agreed to "stipulate" as to it. Wisniewski said he saw the license and it read, "Premises 2243-2245 Prentiss, t/a Lucky's Tavern, LBD 7-653 in the name of James and Leroy Williams and William E. Ward." The police telephoned one of the licensees, and gave the other two "a verbal warning to be in court the next day as they could be put on the books and charged with lottery." They did not appear at the hearing and "we swore warrants out for their arrest." Defense counsel conceded that the appellants were two of the licensees. On cross-examination the witness said that the man described in the warrant was Henry Jackson, who was also arrested.[2]

---

2. Jackson was charged in a separate indictment. He did not

Wisniewski said he had never seen the appellants until the day of trial although he had made all the observations set forth in the application for the warrant. The State rested and motion for judgment of acquittal was made and denied.

Leroy Williams testified that he was one of the three licensees of the tavern. He, his brother James, and Ward were partners in the business. He was otherwise employed, having worked at Bethlehem Steel for 13 years and was on the daylight shift. He could only be around the tavern at night, his brother, spending the most time at the tavern. His brother was also otherwise employed by the Knight-Hale Freight Line, working different shifts, "all day, but sometimes earlier, sometimes late." The kitchen on the first floor was not used, although it had formerly been used about a year ago in connection with the nightclub which, at one time had a dining room attached. The towel dispenser was not "in use by anyone at the time the police came in." There was one full-time barmaid and "I think there was one part time." He had never seen Jackson until he went to the police station. He had not given Jackson "any authority to do anything at all, directly or indirectly," and to his knowledge neither Ward nor James Williams "had any dealings of any kind with Jackson." He was not "aware of any sort of lottery operation going on" in the tavern, was in no way "responsible for any of this lottery found in" the place, learned from his brother that the police were looking for him and then went to the police station. On cross-examination it was elicited that James Williams lived on the second floor of the premises.[3] In January, February and March of 1968 Leroy Williams went to the tavern two or three times a week, staying "sometimes two, three, four hours." He did not go to the

appear on the date of trial of the appellants and his bail was forfeited. The record before us does not disclose the disposition of his case. The barmaid was also arrested and indicted. She was tried separately and the record before us does not show the result of her trial.

3. During the examination of Wisniewski, objections to testimony regarding a search of the second floor were sustained.

second floor. He did not "work actively" there, not serving drinks or taking any active part in the management. He stayed in the main part of the bar and "sit"—"sometimes I might have a drink or a couple of drinks," talking to the people he knew. He had seen "a scratch sheet" which the barmaid used to keep the tab when she served more than one or two drinks to a customer but had never seen it used "to keep numbers on, other than numbers for drinks, by the waitress. The kitchen was not used to serve food and was closed to the public. He did not know who had access to the kitchen when he was not on the premises, but when there "me and my brother and, well, the barmaid might have occasion to go in there," but not the general public. The kitchen had been rented out around the first of the year to persons whose names he did not remember who "were serving the dining room food." He did not know exactly when the dining room closed. He said that he had never been convicted of a crime. No other evidence was offered. In rendering the verdicts the court said:

> "It seems quite clear to me that the case is very strong as to James Williams, who was one of the licensees who lives over the tavern where these operations took place. The case isn't quite as strong as to Leroy Williams as it is to James Williams. But, it still is difficult for me to understand how one of the licensees who is there several times a week, hours at a time, could have been completely ignorant of a rather substantial lottery operation that is apparently going on constantly under his eye.
>
> So, the verdict, I think, as to both defendants should be and is guilty under the third and fourth counts."

### THE CONVICTIONS UNDER THE THIRD COUNT

The third count of the indictment charged the crime proscribed by Md. Code, Art. 27, § 361. It provides in relevant part, for the indictment and, upon conviction,

for the sentence of, "[t]he owner of any house or office who shall permit the same to be used as a place for selling lottery tickets * * * Any person who shall know that his house or office is used for such purpose shall be considered as permitting the same." The count charged that the appellants "unlawfully and knowingly did permit a certain room located at 2243-2245 Prentiss Place of which they were the owners, then and there to be used as a place for selling lottery tickets." The evidence did not show that the appellants were the owners of the house in which the tavern was located, or under what authority they occupied the premises,[4] only that they were the licensees under a B-D-7 license of the business conducted therein. We are aware that § 368 directs that the courts shall construe the provisions relating to lotteries liberally,[5] but we cannot find that the legislative intent was that the holders of a B-D-7 license which authorizes them to keep for sale and sell all alcoholic beverages at retail at the place therein described, for consumption on the premises or elsewhere during certain stated times (Md. Code, Art. 2B, § 29A) are the owners, within the meaning of § 361, of the house within which the business is authorized to be conducted under the license.[6] We think it obvious that the "owner of any house or office" within

---

4. At one point in the trial defense counsel said during the cross-examination of Leroy Williams as to the location of the towel rack in the kitchen, "He is the owner, Judge, guess he knows where everything is." But we think it apparent this had reference to the ownership of the business and was not sufficient to prove ownership of the house.

5. The Section continues "and shall adjudge all tickets, parts of tickets, certificates, or any other device, whatsoever, by which money or any other thing is to be paid or delivered or the happening of any event or contingency, in the nature of a lottery, to be lottery tickets."

6. We note that by Md. Code, Art. 2B, § 56 every application for a license for alcoholic beverages shall contain the name of the owner of the premises upon which the business sought to be licensed is to be carried on, subsection (8); and a statement must be duly executed and acknowledged by the owner of the premises in which the business is to be conducted assenting to the granting of the license applied for and authorizing designated officials to inspect and search the premises without warrant, subsection (17).

12

the meaning of Art. 27, § 361 includes a person vested with title of property in fee or has title to the leasehold interest under a ninety-nine year lease. See *Brown v. State*, 200 Md. 211, in which the defendant admitted he was the owner of the premises. The Court of Appeals has construed "house or office" to include an automobile. In *Moore v. State*, 199 Md. 676, the judgment was affirmed where the Court found that there was abundant testimony to support a finding that the defendant was "still the owner of the car." See *Robinson v. State*, 229 Md. 503. And in *Bland v. State*, 197 Md. 546, in which a conviction of a charge of permitting an apartment of which the defendant was the owner to be used as a place for selling lottery tickets was affirmed, the Court said, at 549, "It is obvious that, if the search warrant was legal, the evidence was ample to sustain the conviction, because it was undisputed that appellant and his wife were the lessees and occupants of the second floor apartment." [7] So it would appear that interest in property as a lessee is sufficient ownership. But we do not believe that mere occupancy of or presence in a house or office satisfies the requirement of ownership; we think there must be some proprietary interest. See *Scarborough v. State*, 3 Md. App. 208, 218. In *Propst, May and May v. State*, 5 Md. App. 36, the judgment was affirmed on a charge under § 361 as to Ruth Virginia May where it was shown that she resided in the apartment where the lottery slips were found, and that a receipt for the apartment rent had been issued by the landlord to her husband. In the present case there was no proof that the appellants had a proprietary interest in that part of the premises in which the lottery slips were found as legal owners, lessees or otherwise. James Williams resided on the second floor, but that portion of the premises was not involved in the crime and in any event there was no showing under what authority he resided there. As

---

7. In *Bland* a conviction of keeping a room for the purpose of selling lottery tickets (now Art. 27, § 360) was also affirmed.

ownership is a necessary element of the charge under the third count, and as there was no sufficient proof to establish that element, the judgments under the third count must be reversed.[8] In view of our holding we do not reach the question whether the appellants *knowingly* permitted the premises to be used to sell lottery tickets. However, proof of direct participation of the appellants in the lottery was not necessary to prove that element. All that need be shown was *scienter*, or in other words, that they were aware of, or permitted the unlawful use. "On questions of *scienter* reasons for disbelieving evidence denying *scienter* may also justify finding *scienter*", an exception to the general rule that "disbelieving evidence is not the same thing as finding evidence to the contrary." *Brown v. State, supra,* at 215; *Moore v. State, supra,* at 681; *Hayette v. State,* 199 Md. 140, 145.

## THE CONVICTIONS UNDER THE FOURTH COUNT

The fourth count charged that crime under Md. Code, Art. 27, § 362 proscribing the possession of lottery slips. In 1897, the Court of Appeals said in upholding the validity of the statute in *Ford v. State,* 85 Md. 465: "The language of this section is too plain to admit of any discussion as to its meaning." at 474. The statute makes unlawful the mere possession of a lottery slip irrespective of the purpose for which it may be held.[9] at 480. The mere possession of a lottery slip is an indictable offense; it is not necessary to allege or prove the *scienter. Jenkins v. State,* 215 Md. 70, 76 and cases cited. Compare *Cockey v. State,* 243 Md. 322. We think that what constitutes possession within the meaning of the lottery statute is the same as that which constitutes possession within the meaning of the narcotic laws of this State, Md. Code,

---

8. We note that ownership is not an element of the crime proscribed by Art. 27, § 360—the "keeping" of any house, office, or other place for the purpose of selling any lottery ticket. This crime was charged in the second count, but the appellants were not convicted under that count.

9. Except possession for the purpose of procuring or furnishing evidence of violations of any provisions of the law relating to lotteries. The exception is not here involved.

Art. 27, § 277.[10] The Court of Appeals so equated the two crimes in *Jenkins v. State, supra.* Both crimes are *malum prohibitum* and have been upheld as a legitimate exercise of the police power in the face of the contention that their provisions created an indictable offense when there was not only a total absence of criminal intent, but a complete ignorance on the part of the traverser as to what the articles he possessed were. See *Braun v. State,* 230 Md. 82, 89-90. The Court of Appeals and this Court have said that "possession" as used in the narcotic statute must be given its ordinary meaning. *Bryant v. State,* 229 Md. 531, 536; *Speaks v. State,* 3 Md. App. 371, 378; *Stewart v. State,* 1 Md. App. 309, 318. Webster's Third New International Dictionary, unabridged, defines "possession" as "the act or condition of having in or taking into one's control or holding at one's disposal." This definition is in accord with the rules enunciated by the cases in this State. When the proscribed articles are found on the person of the traverser, possession by him is clear.[11] He may also possess them by having them in his immediate control.[12] But there need not be actual physical possession; it is not necessary that the possession be immediate and direct. There may be constructive possession. *Broadway v. State,* 3 Md. App. 164, 166. Sole possession is not required; there may be joint possession in several persons. *Rucker v. State,* 196 Md. 334, 340. The duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title. *Peachie v. State,* 203 Md. 239, 243. See also 91 A.L.R. 2d, *Anno: Narcotic—Possession— What Constitutes,* pp. 812-831.

While the language of the statutes proscribing pos-

---

10. Art. 27, § 277 also makes it unlawful for a person to "have under his control" a narcotic drug. "Possession" and "control" under that statute are two separate offenses. *Bryant v. State,* 229 Md. 537.

11. See for example: *Blager v. State,* 162 Md. 664; *Bradley v. State,* 202 Md. 394; *Franklin v. State,* 208 Md. 628; *Spriggs v. State,* 226 Md. 50.

12. See for example: *Bratburd v. State,* 193 Md. 352; *Rucker v. State,* 196 Md. 334, 339; *Brown v. State,* 207 Md. 282.

session of lottery slips and narcotics may be plain, the application of the meaning of possession to a given factual situation is not always clear cut. Cases previously decided in this State have pertained in large part to the admissibility of the articles rather than the sufficiency of the evidence to establish possession of them. Those cases dealing directly with the question of "possession" serve mainly to point up that each case must be decided in the light of its own facts. In *Yanch v. State,* 201 Md. 296, holding that the trial court erred in permitting the evidence to go to the jury, lottery slips were found in the dining room of a tavern. The defendant's husband was the proprietor of the tavern and the licensee. There was no evidence that she had possession of, or any interest in the tavern or dining room. She "possibly had a possessory interest in the residence part" of the building, but no evidence was found there. The Court found that there was no legally sufficient evidence to support a rational inference that the slips were in her possession. In *Hayette v. State, supra,* the defendant operated a grocery store. There was testimony on the merits by a police officer that while in the store he had seen a man go to the defendant, pass him some coins and heard him tell the defendant "to put fifty cents on 768." Under authority of a search warrant the police searched the store and found lottery slips in the back yard in a trash can. The appellant denied knowledge of how the slips got there, suggesting the cleaning boy may have swept them off the floor where they were thrown by customers. The Court held that the slips found in the yard were admissible. "The yard, no less the store, was part of the appellant's premises. We need not try to guess just how the box and contents got there." But the Court said that on the evidence of the slips the trial court was not clearly wrong in inferring that they did not reach the defendant's premises without his privity or knowledge and *in finding him guilty of keeping a lottery place.* Thus, although the defendant was also found guilty of possession as well as keeping a place for selling lottery tickets and selling a

lottery ticket, the question of whether the slips found in the back yard were "possessed" by the defendant was not decided. The Court said, "If he was properly convicted on any count in each indictment, questions as to other counts are immaterial." p. 142. (Sentence and fine were imposed under each indictment, cumulative as to the fines, concurrent as to imprisonment.) In *Scarborough v. State, supra,* a lottery slip and pay-off slips were found in a tavern of which the defendant's wife was a licensee. The defendant was in a back room. The lottery slip was found in the front room behind the bar "right opposite where Mrs. Emma Scarborough was sitting" and the pay-off slips under the bar. Nothing was found on the person of the appellant or in his immediate presence. We found the evidence insufficient to support a conviction of possession of the lottery records by the defendant. 3 Md. App. 218. In *Stewart v. State,* 1 Md. App. 309, the defendant was found to have been in possession of a narcotic drug found in the mouth of a prisoner whom he had shortly before kissed. In *Broadway v. State, supra,* we found the evidence sufficient to prove possession and control of narcotics where the defendant had fresh needle marks on his arm, admitted taking drugs while on the premises and was in close proximity to the narcotics found when he was apprehended. In *Speaks v. State, supra,* in which the judgment was affirmed, the narcotics were found in an apartment under the control of the appellant and he was hiding in a closet.

None of the cases above discussed were factually apposite to the instant case.[13] The appellants here had control of the premises in which the lottery slips were found as licensees of the business therein conducted but neither of them were physically on the premises at the time of

---

13. *Moore v. State, supra,* relied on by the appellants did not involve "possession" but keeping a place and permitting a place to be used for selling lottery tickets. *Shelton v. State,* 198 Md. 405, involved a conviction under a local lottery law of Prince George's County. The charge was "unlawfully did promote and was concerned in carrying on a lottery" contrary to the statute. The statute did not make possession of lottery slips a crime.

the search. Neither had been observed on the premises during the observations establishing probable cause for the issuance of the search warrant. There was no evidence that either of them had participated directly in the lottery operations. It is not clear from the evidence that they attempted to evade the police. The officer indicated that they had been notified to be in court and when they did not appear arrest warrants were issued. It was not shown how they were arrested. Leroy Williams said he learned from his brother that the police were looking for him and went to the police station. There was no evidence to show that either appellant knew Jackson, the man described in the warrant, or had "dealings" with him and Leroy Williams said he had never seen Jackson until he went to the police station that he had no "dealings" with him and to his knowledge neither did his brother or the other licensee. The testimony of Leroy Williams that he was physically on the premises only two or three times a week, at night, staying "two, three or four hours" and did not work "actively there" was not disputed. His brother spent more time on the premises, and lived on the second floor, but there was a full-time barmaid and, he thought, one who worked part-time. There was no direct evidence on the merits that a lottery operation was being operated in the tavern. The affidavit upon which the search warrant was based was not evidence. *Noel v. State*, 202 Md. 247, 250. The appellants were not in actual physical possession of the lottery slips. Considering the evidence before the court, including the places where the lottery slips were found, we do not believe that it showed directly or supported a rational inference that the appellants had constructive possession of the lottery slips or that they had obtained a measure of control or dominion over the custody of the slips. Thus the lower court could not be fairly convinced beyond a reasonable doubt of the appellants' guilt of the offense charged in the 4th count.

We find that the judgment of the lower court on the evidence as to each of the 3rd and 4th counts as to

each appellant was clearly erroneous and therefore the judgments must be set aside. Md. Rule 1086.

> *As to each appellant: judgment on each of the third and fourth counts reversed and case remanded for a new trial; costs to be paid by the mayor and city council of Baltimore.*