753 A.2d 578

Sean Julian WHITE

v.

STATE of Maryland.

No. 1948, Sept. Term, 1999.

Court of Special Appeals of Maryland.

June 8, 2000.

William P. Robinson, Jr. (Robinson and Anderson, on the brief), Norfolk, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and David R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before MOYLAN, WENNER and BYRNES, JJ.

MOYLAN, Judge.

The appellant, Sean Julian White, was convicted by a Wicomico County jury, presided over by Judge D. William Simpson, of 1) the importation of cocaine into Maryland, 2) the possession of cocaine with intent to distribute it, 3) conspiracy to import cocaine into Maryland, and 4) conspiracy to possess cocaine with the intent to distribute it. On this appeal, he raised the three contentions

1) that Judge Simpson erroneously failed to strike two potential jurors for cause;

2) that he was unlawfully seized when the traffic stop of the vehicle in which he was riding was unconstitutionally protracted; and

3) that the evidence was not legally sufficient to establish constructive possession on his part of contraband cocaine found in the trunk of the automobile in which he was riding.

## The Failure to Strike
## Two Potential Jurors for Cause

The appellant's contention that Judge Simpson erroneously failed to strike two potential jurors for cause is presented to us in an unilluminating half a page, with no citation to any appellate decision or any other legal authority. There is no factual recitation detailing what occurred in the course of the jury selection process and there is no legal argument as to any reversible error occurring in the course of that process.

The two potential jurors in question, identified by the appellant only in a subheading, never sat on the jury. They were both subjected to peremptory strikes by the appellant. The appellant does not even tell us whether his peremptory strikes were exhausted at the end of the jury selection process.

Although this contention does not tell us, the key State's witness was Trooper Mike Lewis of the Maryland State Police. Although this contention does not tell us, the two potential jurors in question indicated that they had known Trooper Lewis when they were in high school with him. Both potential jurors, however, indicated that that would not in any way affect their ability to render fair and impartial verdicts. Several other potential jurors also had an acquaintanceship with Trooper Lewis and indicated that that fact might affect their judgments; they were struck for cause. Were the merits of this contention before us, we would see no abuse of discretion in Judge Simpson's refusing to strike these two jurors for cause.

What is absolutely dispositive of the contention, however, is that at the end of the jury selection process, defense counsel indicated that the jury was acceptable to the defense. Under precisely the same circumstances, Judge Rodowsky

held for the Court of Appeals in *White v. State,* 300 Md. 719, 729, 481 A.2d 201 (1984), that such an announcement of satisfaction with the jury is a waiver of any challenge with respect to the jury selection process:

> We have also held that a claim of error in the denial of a challenge for cause was waived by defense counsel's announcing satisfaction with the jury after all peremptory challenges had been exhausted.

In *Calhoun v. State,* 297 Md. 563, 579, 468 A.2d 45 (1983), Judge Smith announced for the Court of Appeals a similar conclusion:

> The trial judge overruled a challenge for cause. One of Calhoun's peremptory challenges was then exercised. Calhoun contends that the refusal of the trial judge to grant his challenge for cause effectively reduced the number of his peremptory strikes from twenty to nineteen.
>
> There is both a short and a long answer to Calhoun's contentions. The short answer is that counsel said, "[W]e are satisfied[,]" after the last juror was sworn subsequent to the exhaustion of Calhoun's peremptory challenges. The State then announced its satisfaction. Thus, the point is waived.

## The Claim of
## Unconstitutional Detention

The appellant's contention that he was unconstitutionally detained is significant more for what it is not than for what it is. The appellant absolutely is not contending that the search of the automobile in which he was riding, which search produced 194 grams of cocaine, was a violation of his Fourth Amendment rights.[1] Indeed, the appellant begins this very

---

1. This case, along with the companion case of *Charity v. State,* 132 Md.App. 598, 753 A.2d 556 (2000), illustrates the at-times critical importance of Fourth Amendment standing to object. Charity, the driver of the automobile in which cocaine was found, enjoyed the standing to raise a Fourth Amendment challenge. In his case, we held that the cocaine found in the trunk of his automobile should have been

contention by reiterating his earlier concession that he had no standing to challenge the search of the automobile in which he was riding:

> While *Appellant conceded that he had no standing to challenge the search of Charity's vehicle,* because he had no possessory interest therein, he nevertheless was the subject of an unlawful seizure of his person pursuant to the actions of Trooper Lewis.

(Emphasis supplied).

At the brief suppression hearing on August 10, 1999, that part of it in which the appellant was involved is covered by a bare three-and-a-half pages of the transcript. At the outset, the State challenged the appellant's standing to object to the search of the codefendant's automobile. In an apparent tactical effort to distance himself as far as possible and as quickly as possible from any interest in that automobile, the appellant leaped at the opportunity to concede the lack of standing:

> [Appellant's counsel]: Your Honor, if the State is willing to concede that Mr. White had no possessory interest in the vehicle, ergo he would not have standing, we will concede it.

When the State, looking ahead to its trial responsibility of proving joint possession, refused to make any mutual concession, the appellant took the stand and, in half a page, disclaimed any possessory interest or ownership in the vehicle.[2]

---

suppressed and that his conviction would, therefore, have to be reversed. In this case, by contrast, the appellant failed to show that he was anything more than a "mere passenger" in the car. He, indeed, conceded that he had no standing to object to the search of the car. His convictions are affirmed.

The predominant focus of this appeal is a challenge to the legal sufficiency of the evidence to show a connection between the appellant and the contraband. The exclusive focus of Charity's appeal was on the Fourth Amendment suppression issue. In terms of appellate strategy, one never knows whether "the road not taken" might not have been a better choice.

**2.** It occurs to us that the appellant, had he tried to do so, might have been able to establish a sufficient connection with the automobile to show that he was more than a "mere passenger" within the contemplation of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387

The colloquy between Judge Simpson and defense counsel immediately concluded:

[Appellant's counsel]: I think as to Sean White, Your Honor, there is no possessory interest . . .

The Court: Well, *do you agree then there is no standing?*

[Appellant's counsel]: *I will agree.*

The Court: All right. There is no standing for Mr. White.

(Emphasis supplied).

■ At that point, the appellant withdrew from the suppression hearing. The hearing went on as to the codefendant, Charity, alone. In any event, the appellant is not raising any issue with respect to that suppression hearing or with respect to Judge Simpson's ruling on the search of the trunk of the automobile. In some vague and amorphous way, the appellant is generally complaining, for the first time on appeal, that when the traffic stop of the driver of the automobile was protracted beyond the time reasonably necessary to serve the purpose of that stop, that prolongation of the stop amounted to a coincidental detention of the appellant himself. He cites no case law or other authority and makes no legal argument in support of the proposition that such a coincidental detention amounts to a violation of his Fourth Amendment right.

More directly to the point, however, is that the appellant points to no fruits flowing from such a detention. Even if, *arguendo*, such a coincidental detention were a Fourth Amendment violation, the appellant makes no argument that it produced anything that in any way prejudiced him. We are

---

(1978), and to qualify, therefore, for derivative standing with respect to the car. The deliberate trial tactic of the appellant, however, was to disclaim any connection with the car other than being a "mere passenger" in it. It is also clear that on the issue of standing, the burden of production is not on the State to prove non-standing but on the defendant to prove standing. *Rakas*, 439 U.S. at 130–31, n. 1, 99 S.Ct. 421. During the brief exchange before the hearing judge with respect to this appellant's lack of standing, the appellant produced nothing that might have entitled him to derivative standing nor did he make any argument in that regard, either before the suppression hearing judge or before us.

not about to make arguments for him in that regard that he does not make for himself. There was no post-detention frisk of his person or search incident to arrest which produced any physical evidence taken from him and no such evidence was introduced. The search of the trunk of the automobile, the only investigative event of any significance in this case, directly resulted from the marijuana found on the person of the driver when he was frisked. The detention of the appellant, even if assumed to have been unconstitutional, was not the cause of the search of the trunk. The appellant points to no fruits to be suppressed. It is a contention that goes nowhere.

Equally dispositive of the contention now advanced is that it was never raised in any way before Judge Simpson. At the suppression hearing, the appellant never argued with respect to this coincidental detention of his person. At trial, the appellant at no time made any objection that any evidence was the product of such an allegedly unconstitutional detention. However meritless the contention may be in hindsight, it has not been preserved for appellate review.

### Legal Sufficiency of the Evidence
### As to Joint Possession of Contraband

As a deliberate trial tactic, the appellant has chosen to pitch the battle almost exclusively on the ground of the legal insufficiency of the evidence to connect him to the contraband. His argument is that he was a mere passenger in the automobile in which the contraband was found. At the time the car was stopped, the appellant was in the right front seat. The contraband was concealed in a box in the trunk. The appellant claims that there was nothing to indicate that he had any knowledge of the cocaine that the driver was carrying in the trunk of his car.

Unlawful possession, however, need not be direct nor need it be exclusive. It may be constructive and it may be joint. As we explained in *Folk v. State,* 11 Md.App. 508, 511–12, 275 A.2d 184 (1971):

It is well-settled that the proscribed possession of marihuana or of narcotic drugs under the Maryland law need not be sole possession. "[T]here may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title." *Jason v. State,* 9 Md.App. 102, 111, 262 A.2d 774. See also *Munger v. State,* 7 Md.App. 710, 256 A.2d 888; *Davis and Napier v. State,* 7 Md.App. 667, 256 A.2d 819; *Scott v. State,* 7 Md.App. 505, 256 A.2d 384; *Hernandez v. State,* 7 Md. App. 355, 255 A.2d 449; *Haley v. State,* 7 Md.App. 18, 253 A.2d 424; *Williams v. State,* 7 Md.App. 5, 252 A.2d 880.

*See also Rich v. State,* 93 Md.App. 142, 149–51, 611 A.2d 1034 (1992). *And see McDonald v. State,* 347 Md. 452, 473–75, 701 A.2d 675 (1997); *Pearson v. State,* 126 Md.App. 530, 536–43, 730 A.2d 700 (1999); *Hall v. State,* 119 Md.App. 377, 392–94, 705 A.2d 50 (1998).

The State's case was based exclusively on the testimony of Maryland State Police Sergeant Michael Lewis. Sergeant Lewis was a 15–year veteran with the State Police and was, at the time of the stop, assigned to the Criminal Interdiction Unit. He had extensive training in enforcement of the narcotics laws and had participated in between 600 and 800 felony drug arrests.

He was on duty in an unmarked State Police cruiser on the evening of Thursday, January 21, 1999, when he stopped a 1993 Nissan Maxima for a minor traffic violation. The Nissan Maxima was southbound on U.S. Route 13 as it bypassed the City of Salisbury. The point of the stop was approximately five miles from the Delaware state border. The Nissan Maxima was occupied by two individuals. The driver and owner of the automobile was one Kendrick Orlando Charity. The appellant was the lone passenger and was seated in the right front passenger seat. Ultimately recovered from the trunk of the car were 194 grams of powdered cocaine. Sergeant Lewis testified that if turned into crack cocaine, the 194 grams would have a street value of approximately $38,000.

Before we recount in further detail the evidence showing that the appellant was at least in joint constructive possession of the narcotics, we would note the opinion of this Court in *Middleton v. State*, 10 Md.App. 18, 267 A.2d 759 (1970). In that case, Middleton was one of two persons in control of a 1968 white Plymouth which had been stolen in South Carolina. A search of the trunk of the stolen Plymouth by Baltimore City police officers revealed, *inter alia*, narcotics and narcotics paraphernalia. Although in *Middleton*, to be sure, the appellant was just as much in control of the car as was his companion, whereas in this case the companion was the driver and registered owner, we nonetheless find some significance in the holding of *Middleton*. It concluded from the fact that the defendant there was one of two persons in control of the vehicle that he could be charged with knowledge of the prohibited drugs being carried in the trunk of the vehicle:

These convictions were predicated on finding prohibited narcotics . . . in the South Carolina vehicle on March 6. As appellant was shown by the evidence to be, at least, in joint exclusive possession of the vehicle with Galliard, we cannot say that the trial judge was clearly erroneous in finding appellant guilty of these offenses.

10 Md.App. at 31, 267 A.2d 759. In *Middleton*, as in this case, the defendant deliberately declined to attack the legality of the search of the vehicle in a tactical effort to open up as much distance as possible between himself and the vehicle. As Chief Judge Robert C. Murphy noted for this Court, 10 Md.App. at 31 n. 5, 267 A.2d 759:

Appellant's trial tactics, carried over on appeal, were to disavow any and all connection with the South Carolina car; it was apparently for this reason that he declined to attack the legality of the search of that vehicle.

In this case, as the appellant vigorously points out, the contraband was found in an automobile registered not to the appellant but to his traveling companion. What is required by way of proof, however, is not direct possession but only constructive possession, not exclusive control but only joint

control. In that regard, we find the opinion for this Court by Judge Wilner in *Butler v. State,* 41 Md.App. 677, 398 A.2d 514 (1979), helpful. In that case, the contraband was found in a satchel carried not by the defendant but by a traveling companion.

A Maryland State Trooper there observed Butler and a companion arrive together at the Baltimore–Washington International Airport. The two men were about ten feet apart as they walked away from the airplane. Butler was carrying a clothing bag. His companion was carrying the tan satchel which contained the contraband. Inside the terminal building the two men stopped at the information booth and had a 10–to–15–second conversation. They left the terminal and were attempting to enter a cab together when they were stopped by the police.

With respect to Butler's attempt to disclaim joint constructive possession, Judge Wilner held:

> Appellant's first argument is that, as the lactose and quinine were found in the satchel carried by Davis, there was no evidence to show that they were ever in his possession. Possession of contraband to be criminal, however, need not be exclusive or actual. There may be joint possession and constructive possession, either of which will suffice to sustain a conviction. The proximity of the two men—leaving the plane, conversing in the terminal, and attempting to enter the same cab—coupled with the presence of prescription drugs with appellant's name on them in the satchel, more than sufficed to establish a joint or constructive possession of the contraband.

41 Md.App. at 679, 398 A.2d 514 (citations omitted).

The evidence of joint participation in a common enterprise was strong in the case now before us. The route being traveled by the two men was not without significance. The evidence was that on January 20, 1999, the two occupants of the vehicle had left the area of Norfolk, Virginia; had passed through the Chesapeake Bay Bridge–Tunnel to the Delmarva Peninsula; and had driven north to New York City. The

evidence further showed that on the next day, January 21, they were on their southbound journey from New York City back to the Norfolk area when they were stopped just outside Salisbury. The evidence thus showed at least a two-day overnight round-trip of approximately 600 miles from Southern Virginia to New York City and back again. On direct examination, Sergeant Lewis testified with respect to U.S. Route 13:

U.S. Route 13 is a main conduit, a large pipeline for criminal activity coming from New York which remains our number one source city in the world today for narcotics traveling to the southern states which is Virginia, North Carolina, South Carolina and Georgia.

On cross-examination, he testified further as to the significance of New York City as a source of narcotic drugs:

Q: You testified that New York City is a number one source city for powdered cocaine?

A: That's correct.

Q: Can you describe what that means, being a source city?

A: It means the majority of every seizure that occurs within the continental United States, the cocaine that is seized is either destined for or coming from New York City.

Q: And how does the cocaine get from the source city being New York City to other destinations such as Salisbury or Norfolk, Virginia, or other areas in the Mid Atlantic Region?

A: It is smuggled down major pipelines by automobile, down U.S. Route 13, Interstate 95, U.S. Route 301 through Maryland.

When they were stopped, the driver, Charity, handed over a North Carolina driver's license. The appellant handed over a New York State driver's license. It subsequently developed that the appellant also had a year-old restricted license from Virginia. The appellant never indicated, either by way of an extrajudicial statement to Sergeant Lewis or by way of trial testimony, that he was just a social friend of the driver who had been taken along on the journey to New York and back

simply "for the ride." He indicated to Sergeant Lewis that the two men had gone to New York together "for a couple of days" and were, when stopped, on their way back to Virginia to attend a funeral. He never indicated why they had gone to New York in the first instance:

He told me that they were coming from New York, and they had been up there for a couple of days and were headed down to Chesapeake, Virginia to attend a funeral for his uncle:

Q: Did he specifically say, they?

A: Yes.

Q: In the plural?

A: He did.

The trip was extensive enough to permit a reasonable inference that the appellant was not ignorant of the purpose of the trip to New York and back. One strong piece of evidence in that regard was the presence in the passenger compartment of the automobile of 72 air fresheners. In the third week of January, at a time when automobile windows would ordinarily be closed, the overpowering smell could not have failed to provoke some inquiry, if the knowledge of the purpose of the air fresheners had not already been well known to the appellant. Sergeant Lewis testified with respect to the air fresheners:

Q: When you noticed this odor of air fresheners coming from inside the car, where were you standing?

A: Standing next to the driver's door.

Q: Could you describe the intensity of the odor that you smelled inside, coming from inside the car?

A: I stood next to the driver's door for a very short period because I was literally having difficulty talking because of the overwhelming odor. . . .

Q: Have you seen such air fresheners in your experience in the past?

A: Hundreds of times in narcotics cases.

Q: Why?

A:  To mask the odor of the CDS coming from the vehicle, to avoid K–9 detection.

Q:  The number of air fresheners, 72, that you saw inside the car, would you consider that an unusual number based on your experience of air fresheners?

A:  It was the most I have ever seen in one vehicle.

Two factors belying an innocent explanation for the trip to New York and back were 1) the inconsistency between their versions of the trip told by the two occupants of the automobile and 2) the inconsistency between either of those versions and the actual truth.  The appellant told Sergeant Lewis that he and Charity "had been up there [New York] for a couple of days."  Charity, on the other hand, told Sergeant Lewis that "they had been up there for about a week."

In fact, neither version was true.  Sergeant Lewis recovered from the center console of the automobile a Bay Bridge–Tunnel receipt indicating that the car had passed across the Bridge–Tunnel to the Delmarva Peninsula on January 20, one day before.  A receipt for the purchase of a used tire also confirmed the presence of the car and its occupants in Chesapeake, Virginia on January 20.  Another toll receipt showed that the car had passed through the Queens Mid–Town Tunnel in New York at 1:20 P.M. on January 21, some hours before it was stopped in Salisbury.

Another indication that the appellant was no "mere passenger" but a significant occupant of the vehicle for an extended trip was the presence of his clothing in the car.  Hanging up in the passenger compartment by the right rear passenger seat were the appellant's clothes.  He identified them to Sergeant Lewis as his, as he explained that these were the clothes he intended to wear to the funeral.  The appellant also had a travel bag in the trunk.  Sergeant Lewis explained:

I saw two other small travel bags in the trunk.  Each had clothes in it.  Each had toiletries in it, and there were miscellaneous paper work items such as the restricted license in one of the bags believed to belong to Mr. White.

Q: All right. Were there some other documents in a bag that belonged to Mr. White?

A: Yes, sir.

Q: Court documents, things like that?

A: And some photographs, yes, sir.

Q: And some photographs.

Three items were in the trunk. There was a travel bag owned by each of the car's occupants, one by the appellant and one by Charity. In addition, there was a large box, ostensibly of pots and pans and sealed with factory packaging tape. Sergeant Lewis noticed that on the bottom of the box, the packaging tape appeared to be re-taped as if it had been removed and then replaced. When he pulled the tape off and pulled the box open, he found inside the "brand new pots and pans still packaged in the original packaging" the "approximately half a pound of cocaine."

A case that bears an amazing similarity to the one now before us is *Pugh v. State*, 103 Md.App. 624, 654 A.2d 888 (1995). In that case, a car, with two occupants, was stopped in Worcester County as it was headed back to Virginia after a round-trip to New York. The same U.S. Route 13 corridor between the Norfolk area and New York City was also involved in that case. It was also Trooper (now Sergeant) Michael Lewis who made the interdiction. Contraband drugs were found "secreted in a spare tire in the trunk." One of the two codefendants convicted of unlawful possession, Kelley, claimed that he was a mere passenger with no knowledge of what was hidden in a spare tire in the trunk of the car:

Kelley contends that the evidence was not sufficient to support a finding that he had knowledge of the drugs that were secreted in a spare tire in the trunk of the car. He argues that the evidence established that he was asleep in the passenger seat of the car, the vehicle was rented by someone other than himself, and he had no knowledge of any drugs in the car.

103 Md.App. at 651, 654 A.2d 888.

In affirming the conviction, Judge Hollander reasoned that 1) the inconsistent story told by Kelley about his trip to New

York and 2) Kelley's nervous avoidance of eye contact contributed significantly to the establishment of guilty knowledge on Kelley's part:

To establish that Kelley was guilty of possession of cocaine under Art. 27, § 287(a), the State had to prove, beyond a reasonable doubt, that Kelley had possession of the illegal substance. Knowledge is one element of this offense. Therefore, for Kelley to have possessed the controlled substance, he must have known of the presence of the substance, and the general character or illicit nature of it. Such knowledge, however, "may be proven by circumstantial evidence and by inferences drawn therefrom."

At trial, the prosecution established that *Kelley was a passenger in a rented car stopped for a traffic violation.* Trooper Lewis testified that *Kelley avoided eye contact.* He also testified that *Kelley offered inconsistent stories regarding why he had gone to New York* and his reasons for driving to Virginia with Pugh....

We conclude, when viewing the evidence in the light most favorable to the State, that there was sufficient (albeit not overwhelming) evidence for a rational jury to find that Kelley had knowledge of the hidden cocaine.

103 Md.App. at 651–51, 654 A.2d 888 (footnote and citation omitted; emphasis supplied).

The same nervous avoidance of eye contact described by Judge Hollander was also exhibited by the appellant in this case. Sergeant Lewis testified with respect to it:

Q: Did you notice anything about Sean White's behavior while you were talking to him and to the driver?

A: Yes, sir.

Q: What did you notice?

A: As I stood next to the passenger door, he wouldn't look at me at all. In fact, he kept looking into the rear view mirror to his right looking at the driver who was standing behind us at the vehicle. He avoided eye contact with me—

. . .

Q: Any other observations about Sean White's behavior?

A: He wouldn't look at me.

. . .

The Court: ... What did you see him do that made you think he was nervous?

The Witness: He wouldn't look at me at all, Your Honor.

*Colin v. State,* 101 Md.App. 395, 646 A.2d 1095 (1994), is also a case that bears a strong similarity to the one at bar. That case also involved the Route 13 corridor between New York City and the Norfolk or Hampton Roads area of Virginia. An automobile bearing Virginia license tags was stopped as it was southbound in the vicinity of Salisbury. Although the driver had a Connecticut driver's license, the automobile had been rented by the Enterprise Rental Car Company in Hampton, Virginia to the girlfriend of the driver. A search revealed that hidden within the left-rear door panel was cocaine with a street value of up to $25,600.

Colin, the passenger in that automobile, asserted the same defense as does the appellant in this case:

> Appellant *Colin contends that he was not in close proximity to the drug because he was in the front passenger seat whereas the drugs were found in the left rear door interior.* He further argues that he was unaware of the presence of the cocaine and therefore never exercised "dominion or control" over the substance.

101 Md.App. at 407, 646 A.2d 1095 (emphasis supplied).

In rejecting that defense and in holding that the evidence was legally sufficient to support Colin's convictions, Judge Alpert said for this Court:

> As a passenger, it may be true that Colin did not exercise "control" over the vehicle. *Colin was traveling in the same vehicle as the cocaine, however, and that is sufficient to establish "close proximity."* Although the cocaine was not in plain view, being secreted away in the door, this factor is also not determinative. Rather, the circumstantial evidence adds up to a revealing picture. Colin initially told Deputy

Houck that his name was "Tony Morris." Testimony revealed that Colin and Heath displayed a nervous response as the officers searched the door where the cocaine was later found. *Colin's failure to be truthful to the officer* and nervousness as the search progressed closer and closer to the location of the cocaine *could reasonably be interpreted as showing that he had something to hide* and that he knew where it was to be found.

*Id.* (emphasis supplied).

The appellant, in his brief, insists that "the narcotics located in a sealed cardboard box in the trunk were not in plain view." Neither, of course, were the narcotics in *Colin* that were secreted inside the left passenger door panel. Neither were the narcotics in *Pugh* which were hidden inside the spare tire in the trunk of the car. In this case, the box containing the narcotics was in the trunk itself in close proximity to the appellant's suitcase. In neither *Colin* nor *Pugh* was any property belonging to the passenger-defendant found in the place—the door panel or the spare tire—where the drugs were found. The 72 air fresheners, moreover, give the State's case here a weight that was not present in either *Colin* or *Pugh*. There was evidence in this case, unlike the situations in *Colin* and *Pugh,* that the appellant had been a companion of the driver for the entire round-trip from Virginia to New York City and back again to the point where the automobile was stopped.

The appellant's reliance on *Dawkins v. State,* 313 Md. 638, 547 A.2d 1041 (1988), is misplaced. *Dawkins* did not deal in any way with the legal sufficiency of the evidence to sustain a case of joint constructive possession. *Dawkins* stands for the now well-accepted proposition that knowledge of the presence of contraband drugs is a necessary element of the possessory crimes and that a defendant, on timely demand, is entitled to a jury instruction with respect to that element. In *Dawkins,* the trial judge ruled that knowledge was not an element of the offense and declined to give such an instruction. That was the basis for the reversal in *Dawkins*. *Dawkins* simply did not

deal in any way with the legal sufficiency of the evidence in that case and, therefore, has no bearing on this case.

■ We hold that the evidence was legally sufficient to permit the jury reasonably to infer that the appellant was in joint constructive possession of the cocaine hidden in the trunk of the automobile in which he was riding.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*