654 A.2d 888

**Dennis Bernard PUGH**

v.

**STATE of Maryland.**

**Morgan Adam KELLEY, Jr.**

v.

**STATE of Maryland.**

Nos. 622, 636, Sept. Term, 1994.

Court of Special Appeals of Maryland.

March 1, 1995.

James V. Anthenelli, Salisbury and Robert C. Gottlieb, Commack, NY (Laurie S. Hershey, of Counsel) for appellant, Pugh.

Richard A. Parolski, Ocean City and Thomas C. Hill, P.C. and Shaw, Pittman, Potts & Trowbridge, Washington, DC, for appellant, Kelley.

Diane E. Keller, Celia Anderson Davis, Asst. Attys. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore and B. Randall Coates, State's Atty. for Worcester County of Snow Hill, on the brief), for the state.

Submitted before CATHELL, MURPHY and HOLLANDER, JJ.

HOLLANDER, Judge.

Dennis Pugh, appellant in No. 622, and Morgan Kelley, Jr., appellant in No. 636, were co-defendants below; they were charged with various narcotics offenses and were tried jointly by a jury sitting in the Circuit Court for Worcester County. As appellants were tried together and present common issues on appeal, we shall consider together their separately noted appeals.

On January 11, 1994, the jury convicted Pugh of the following: bringing into Maryland an amount of cocaine exceeding twenty-eight grams, in violation of Md.Code Ann., Art. 27, § 286A (1992 & Supp.1994); occupying a position as a "drug kingpin," as defined and proscribed in Art. 27, § 286(g); possession of cocaine with intent to distribute, in violation of Art. 27, § 286(a)(1); and possession of cocaine, in violation of Art. 27, § 287. Kelley was convicted of the same offenses, but, after trial, the court granted Kelley's motion for judgment of acquittal with respect to his conviction as a "drug kingpin."

On April 8, 1994, Pugh was sentenced to twenty-five years incarceration, without parole, for the "drug kingpin" conviction, a concurrent twenty-five year term for bringing into the State an amount of cocaine exceeding twenty-eight grams, and a concurrent twenty-year term for possession with intent to distribute, into which the simple possession conviction was merged. Kelley was sentenced on the same date to a total of twenty-five years incarceration.

Appellants were jointly represented by the same attorneys. Central to their appeals are appellants' claims that they were denied their constitutional right to effective assistance of counsel in part because of a serious conflict of interest resulting from dual representation. Because we are unable to find the requisite facts, from the record now before us, we hold that appellants' claims as to conflict of interest and ineffective assistance must be addressed through post conviction proceedings instituted pursuant to Md.Code Ann., Art. 27 § 645A (1992 & Supp.1994). As to appellants' remaining assertions,

we perceive no error and shall therefore affirm the judgments in all respects.

## ISSUES

Pugh presents the following questions, which we have rephrased slightly for clarity:

I.   Was the evidence sufficient to sustain appellant's conviction as a "drug kingpin," under Article 27, § 286(g)?

II.   Was appellant denied effective assistance of counsel?

A.   Was defense counsel laboring under a conflict of interest because counsel represented both Pugh and Kelley at their joint trial?

B.   Did defense counsel fail to represent appellant competently because counsel failed to file timely a motion to suppress?

C.   Did appellant have a meritorious motion to suppress, such that his defense was prejudiced by counsel's failure to file timely the motion?

III.   Did the trial court err in failing to act, *sua sponte*, regarding defense counsel's joint representation of appellants?

IV.   Was appellant's constitutional right to be present at a critical stage of the proceeding violated when he was not present for argument on the State's motion to strike the defense's motion to suppress?

V.   Did the trial court err in granting the State's motion to strike the defense's motion to suppress?

Kelley presents these related questions:

I.   "Was the State's evidence sufficient to support [Kelley's] convictions for possession with intent to distribute cocaine and importation of cocaine when the uncontroverted evidence simply established that [Kelley] was asleep as the passenger in a car driven by his co-defendant, rented to a third person unknown to [Kelley], when the cocaine was secreted in the spare tire in the car's trunk and appellant had no access to the

trunk and no knowledge of the presence of the cocaine?"

II. "Did the court commit error by failing to instruct the jury that [Kelley's] knowledge of the existence of the cocaine was an essential element of the crimes charged?"

III. "Were [Kelley's] fifth and sixth amendment rights violated when he was represented by counsel who without explaining the actual conflict of interest and without obtaining waiver represented both the passenger [Kelly] and the co-defendant driver of the car?"

## FACTUAL SUMMARY

The following factual summary is gleaned from the evidence presented at trial.

On the morning of Wednesday, May 13, 1992, Corporal Ernest Leatherbury of the Maryland State Police and Trooper First Class Mike Lewis had parked their unmarked police cars in the median of Route 13 in Worcester County in the vicinity of Stockton Road. Corporal Leatherbury's police car was facing south and Trooper Lewis's police car was facing north so that their driver's side doors were side-by-side. At approximately 7:20 a.m., while the troopers were speaking, they observed a 1992 blue Pontiac Grand Prix with its lights on traveling southbound in the right-hand lane of Route 13. The troopers believed that the Pontiac was exceeding the posted speed limit of fifty-five miles per hour. When the Pontiac passed the troopers' position, they observed that its brake lights were on.

Corporal Leatherbury waited until the Pontiac was out of sight, then pursued the Pontiac in an attempt to "pace" the car.[1] After Corporal Leatherbury's police car was out of sight, Trooper Lewis also proceeded southbound on Route 13 in pursuit of the Pontiac.

---

1. At trial, Trooper Lewis testified that "[a] pace is where we maintain a constant distance from the vehicle in which we are attempting to ... get a speed on in an attempt to try to determine what speed the vehicle was travelling."

When Corporal Leatherbury paced the Pontiac, he determined that it was travelling at approximately fifty-five miles per hour. While the corporal was behind the Pontiac, he observed that approximately half of the vehicle crossed the center line. Consequently, Corporal Leatherbury executed a traffic stop of the Pontiac "[f]or crossing the center line, not driving in a designated lane." As the corporal was stopping the Pontiac, Trooper Lewis arrived at the scene.

Corporal Leatherbury approached the driver's side of the Pontiac and asked the driver, later identified as Pugh, for his driver's license and registration. Trooper Lewis approached the passenger side of the Pontiac and spoke to Kelley, who was the passenger. When Pugh could not produce his license, Corporal Leatherbury asked Pugh to accompany him to his police car. After learning Pugh's name, address, and date of birth, the corporal, through a radio check, was able to determine that Pugh was a licensed driver. The corporal also learned that the Pontiac had been rented to one Mary Holman in New York. At some point, the troopers obtained a copy of the rental contract.

Trooper Lewis spoke with Kelley, who remained seated in the Pontiac; he learned that appellants were supposedly travelling from Brooklyn, New York to Norfolk, Virginia. Trooper Lewis noticed a brown jacket on the back seat of the Pontiac with an airline ticket protruding from the pocket. Kelley informed Trooper Lewis that he had travelled to New York "... yesterday, to see my mom for Easter, I mean Mother's Day." Trooper Lewis said that Kelley also informed him that he had travelled to New York to pick up a car he was planning to buy and that the two men did not have any luggage. The trooper commented to Kelley on what the trooper thought was a "big bulge" in Kelley's front left pants pocket. In response, Kelley reached into his pocket and pulled out a "wad of money." Trooper Lewis further testified that Kelley said he was unemployed.

The troopers then privately discussed their observations of the two men and they agreed that they should request permis-

sion to search the Pontiac for drugs and contraband. As Pugh was the driver, Corporal Leatherbury obtained his consent to search the Pontiac. But when Kelley stepped out from the Pontiac, Trooper Lewis also asked him if he had "any problem" with the troopers' search of the vehicle. Kelley responded that he did not, and also gave his consent to a search of his person.

Trooper Lewis searched the Pontiac while Corporal Leatherbury watched appellants, who were standing beside the car. When he searched the trunk of the car, Trooper Lewis observed that the carpeting was in disarray. He pulled back the carpet, and noticed that "the cardboard panel that covers the spare tire well in the floor was loose. It wasn't bolted down. . . ." The trooper then removed the cardboard panel and found an old Firestone Supreme tire that was deflated and covered with brake dust. In contrast, there were four new B.F. Goodrich tires on the Pontiac. Trooper Lewis also observed marks around the perimeter of the Firestone tire. As a result, he asked appellants if they had had a flat tire during the trip and both men responded in the affirmative.

Trooper Lewis removed the tire from the trunk. He realized that it was unusually heavy and that there were some "obstructions" in the tire. After Trooper Lewis pried the rubber loose he observed some "gray duct tape packages" in the tire. At that point, Pugh and Kelley were placed under arrest. Trooper Lewis then cut the tire open and recovered "eleven large duct tape packages." Also recovered were $286.00 from Pugh and $44.00 and a beeper from Kelley.

Subsequent analysis of the packages revealed that they contained 2307.7 grams of powdered cocaine and 1472 grams of crack cocaine. At trial, Trooper Lewis, testifying as an expert in drug interdiction, estimated the value of the cocaine recovered from the spare tire at $508,980.00.

Kelley testified at trial. He denied that he had any knowledge of the cocaine hidden in the spare tire, that he had ever seen the Pontiac before Pugh offered him a ride, and claimed he did not know who had rented the car.

Kelley explained that on the day before his arrest, he had flown to New York from Norfolk to visit his mother and retrieve his car, which was being repaired following an accident six weeks earlier. After arriving in New York, Kelley learned that his car was not ready, but did not have enough money to return to Norfolk. While standing in front of his "mother's building," he ran into Pugh, whom he knew from the "community." Kelley asked Pugh to lend him some money to pay for his return trip to Norfolk. Pugh informed Kelley that he could not lend him any money, but offered to drive Kelley back to Norfolk, provided Kelley was willing to leave immediately. Kelley testified that he ran inside to his mother's apartment to get his shirt and shorts and then left with Pugh. Kelley testified that they left New York at approximately 10:00 p.m. and that they made only one stop during the trip.

Pugh also testified at trial. He said that he had been living in Virginia for approximately two weeks prior to his arrest because relatives were helping him to rent an apartment. He had returned to New York from Virginia by bus on the Saturday before his arrest. Pugh explained that he had returned to New York for Mother's Day and to retrieve his car, which was being repaired. Although the repairs to his car were not complete, Pugh testified that he had to return to Norfolk to "finalize" the rental of an apartment. As a result, he rented the Pontiac from a friend, Philip Holman, whom he knew "from the neighborhood;" Pugh planned to return to New York with the Pontiac on Friday. Pugh explained that there was no luggage in the car because he had clothes both in New York and in Virginia. Finally, Pugh denied any knowledge of the cocaine found in the spare tire.

We shall set forth additional facts as necessary to our discussion of the issues presented.

## DISCUSSION

### I. Conflict of Interest

At trial, Pugh and Kelley were jointly represented by an out-of-state attorney, admitted to practice in Maryland *pro*

*hac vice.*[2] Appellants contend that defense counsel's joint representation resulted in an inherent conflict of interest that adversely affected counsel's performance.

Pugh complains that his attorney's divided loyalties adversely affected counsel's representation of him because counsel used Pugh's position as the procurer and driver of the Pontiac in an effort to establish Kelley's lack of knowledge, as the passenger, of the cocaine secreted in the spare tire. Pugh argues that, because of the conflict, counsel was ineffective as to him.

Similarly, Kelley avers that counsel was not as zealous as he would have been had he not also been representing Pugh. He states that "every decision by . . . trial counsel suffered from the fact that he was representing not only Kelley, but Dennis Pugh against whom the evidence was significantly stronger." Therefore, Kelley claims, "his counsel was precluded from arguing the lesser culpability of Kelley, for fear of implicating his other client, Pugh." Additionally, Kelley complains that he was prejudiced because counsel could not competently advise him about whether he should testify once Pugh decided to testify.

Multiple representation results in an impermissible conflict when an attorney represents one client "whose interests are adverse to those of another client." *Att'y Grievance Comm'n v. Kent,* 337 Md. 361, 379, 653 A.2d 909 (1995). It is well settled that "[t]he constitutional right to counsel, under the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, includes the right to have counsel's representation free from conflicts of interest." *Austin v. State,* 327 Md. 375, 381, 609 A.2d 728 (1992); *see also Kent,* 337 Md. at 379, 653 A.2d 909.

While appellants were jointly represented by the same attorneys, it does not automatically follow that a conflict of

---

2. Appellants were also represented by the same local attorney.

interest resulted. Although "a possible conflict inheres in almost every instance of multiple representation," *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), an attorney's dual representation of clients "is not per se violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978) (emphasis in original); *see also Austin,* 327 Md. at 386, 609 A.2d 728; *Pressley v. State,* 220 Md. 558, 562, 155 A.2d 494 (1959); *Graves v. State,* 94 Md.App. 649, 658, 619 A.2d 123 (1993), *rev'd on other grounds,* 334 Md. 30, 637 A.2d 1197 (1994); *Gee v. State,* 93 Md.App. 240, 246, 611 A.2d 1081 (1992); *Brown v. State,* 10 Md.App. 215, 221, 269 A.2d 96 (1970). Moreover, as Judge Eldridge recognized in *Austin,* "There is ... no precise test as to when the possible conflict of interest inherent in dual or multiple representation will become an actual conflict of interest." 327 Md. at 386, 609 A.2d 728.

Counsel's comments throughout the proceedings seemingly acknowledge the obvious: the position of a passenger is often considered less culpable than that of a driver who has control of the vehicle. At the preliminary hearing on July 16, 1992, defense counsel stated, in relevant part:

> Certainly, Mr. Pugh, by virtue of his driving and operating the vehicle, having constructive control over the vehicle and its contents, there is a stronger inference to him.... Although admittedly, because of Pugh's constructive possession or active possession of the vehicle's keys and operation of the vehicle, there is a stronger inference as to him.
>
> \*       \*       \*       \*       \*       \*
>
> ... I certainly submit that as to Mr. Kell[e]y, the posture of the evidence is in entirely different, different posture, because he has no control over the vehicle, and there is not one bit of evidence that he did have any control over the vehicle.

In his opening statement to the jury, defense counsel remarked:

Morgan [Kelley] had nothing to do with the rental of the car or even obtaining the car, because when he ran into Dennis [Pugh], Dennis already had the car.

Further, in closing argument, defense counsel highlighted that it was Pugh who had effectively borrowed the vehicle from Holman and exercised control over it. Counsel stated, in part:

So they are driving down the interstate. Mr. Pugh is driving the car. He is the one that has gotten it from Mr. Holman. Mr. Holman has given him the rental contract. He has that. They are stopped by the police. He doesn't know there is anything in the trunk of the car.

Counsel's comments demonstrate at least a possible conflict of interest stemming from his dual representation of both the driver and the passenger.[3] The comment to Rule 1.7 of the Maryland Rules of Professional Conduct is relevant here. It provides:

An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that

---

3. Rule 1.7 of the Maryland Rules of Professional Conduct states:
   (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
   (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
   (2) each client consents after consultation.
   (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
   (1) the lawyer reasonably believes the representation will not be adversely affected; and
   (2) the client consents after consultation.
   (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.
   *See also* Rule 1.16(a) ("a lawyer shall withdraw from the representation of a client if ... the representation will result in violation of the Rules of Professional Conduct ...").

there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant.

Nevertheless, the mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. Rather, "to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an *actual conflict* of interest adversely affected his lawyer's performance."[4] *Id.* at 348, 100 S.Ct. at 1718 (emphasis added).

On the basis of the record before us, we cannot say that there was an *actual* conflict of interest.[5] On the contrary, appellants' defenses are not necessarily incompatible or inconsistent; Pugh claimed he merely rented the car from Holman, and Kelley claimed, as a passenger, that he never knew what

---

4.  Once a court determines that an actual conflict of interest exists, the court need not " 'indulge in nice calculations as to the amount of prejudice' attributable to the conflict." *Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1719 (quoting *Glasser v. U.S.*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942)). Rather, the actual conflict demonstrates the violation of the right to effective assistance of counsel. *Id.* 446 U.S. at 349, 100 S.Ct. at 1719. "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1719.

5.  Where counsel represents the defendant and a state's witness or a codefendant who testifies adversely to the defendant, the conflict is obvious and egregious. *See e.g., Kent*, 337 Md. at 379, 653 A.2d 909; *Austin*, 327 Md. at 387, 609 A.2d 728; *Graves*, 94 Md.App. at 658, 619 A.2d 123; *Kent v. State*, 11 Md.App. 293, 298, 273 A.2d 819 (1971); *see also United States ex. rel. Williams v. Franzen*, 687 F.2d 944 (7th Cir.1982); *Brown v. U.S.*, 665 F.2d 271 (9th Cir.1982); *Stephens v. U.S.*, 595 F.2d 1066 (5th Cir.1979). A conflict is equally apparent when one of counsel's clients wants to pursue a favorable plea conditioned on cooperation against another client. *Holloway*, 435 U.S. at 490, 98 S.Ct. at 1181–82; *Austin*, 327 Md. at 388, 609 A.2d 728; *Gee*, 93 Md.App. at 251, 256–57, 611 A.2d 1081; *see also U.S. v. Mavrick*, 601 F.2d 921 (7th Cir.1979).

was in the spare tire. *See Brown,* 10 Md.App. at 221, 269 A.2d 96 ("The mere fact that [appellants'] stories are different does usually not present a conflict of interest if the innocence of both parties is maintained by both stories."). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.

Although we cannot conclude that counsel's simultaneous representation amounted to an actual conflict, we also cannot determine that no conflict existed. In *Glasser v. U.S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court recognized that, because the attorney "struggle[d] to serve two masters," he was not as zealous an advocate for appellants together as he would have been had he represented only one or the other. *Id.* at 75, 62 S.Ct. at 467. Recently, in the context of a grievance action, the Court of Appeals observed:

> "As a general rule, whenever one codefendant makes a statement which is exculpatory or which inculpates a codefendant, they cannot be represented by the same attorney because a conflict exists.
>
> "Thus, there also is a conflict where one defendant gives a statement saying that the other was the instigator of the crime, they were involved in a separate crime together, one indicates a desire to become a prosecution witness, one says that the other is more guilty, or the statements raise inconsistent defenses."

*Kent,* 337 Md. at 376–377, 653 A.2d 909 (quoting John W. Hall, Jr., *Professional Responsibility of the Criminal Lawyer* § 13.27 (1987)) (footnotes omitted in *Kent* ).

In *Gee,* where one attorney jointly represented both the buyer and the seller in a drug case, we held that defendants were denied effective assistance of counsel because of counsel's inability to be the zealous advocate to which the parties were entitled. What we said in *Gee* is instructive:

> The only defense that could have been asserted in this case was for each of the appellants to point an accusing

finger at the other. A lawyer, equally dedicated to the fortunes of both, was frozen into inactivity because he could not aid and abet such finger-pointing. Coffey's only defense was to deny any involvement in criminal activity. An advocate championing his cause to the exclusion of all other masters would have had no compunction in assassinating Gee. "Gee alone was in possession of heroin; my client was not." A hard-hitting champion for Coffey might have flailed Gee as a known "junkie" in the neighborhood and would have insisted that the observed transfer was nothing more than Coffey's repayment of a $5.00 loan. Since the contraband was found only on the body of Gee, Coffey's only viable defense was to distance himself from Gee in every way possible, callously leaving Gee hanging out to dry in the process. Because Coffey's defender was also loyal to Gee, however, he was totally inhibited from attempting in any such fashion to "lay off the blame."

*    *    *    *    *    *

The sin of divided loyalty, as it afflicted Coffey, was in nothing his lawyer did but in what his lawyer found himself "compelled to refrain from doing," from his unavoidable "erosion of zeal."

*Gee,* 93 Md.App. at 259–60, 611 A.2d 1081.[6]

The question as to whether counsel labored under an actual conflict is clearly crucial to appellants' claims. While the conflict claim is a serious one, it is best resolved through a post conviction hearing;[7] in order to determine whether there

---

**6.** In the case *sub judice,* Pugh and Kelley did not appear to be pointing their fingers at each other. Rather, Pugh was pointing at Holman and Kelley was merely saying "not me." But we cannot say whether their seemingly compatible defenses resulted from counsel's efforts to reconcile appellants' positions.

**7.** Appellants have already filed a motion for a post conviction proceeding. In fact, at a hearing on a motion for new trial, Kelley's counsel stated:

[A]s the Court is aware, both Mr. Kelley and Mr. Pugh through counsel have filed a motion for a new trial alleging various grounds. As we have previously indicated to the Court with respect to the

was an actual conflict, further factual investigation is necessary. *See, e.g., Cuyler*, 446 U.S. at 338, 100 S.Ct. at 1712–13 (in a post conviction proceeding, the lower court heard five days of testimony to determine whether a conflict existed). As the Court said in *Kent*, "whether or not a conflict exists must be determined by the facts of each individual case." 337 Md. at 379, 653 A.2d 909 (citing *Austin*, 327 Md. 375, 609 A.2d 728; *In re Special Investigation No. 231*, 295 Md. 366, 455 A.2d 442 (1983)).

■ Ordinarily, "consideration of a claim of ineffective counsel is best left to a post conviction hearing...." *Harris v. State*, 295 Md. 329, 337, 455 A.2d 979 (1983); *see also Hunt v. State*, 321 Md. 387, 407, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). This is because the record on appeal usually does not establish the reasons for the challenged acts or omissions of counsel and review by an appellate court would involve " ' "the perilous process of second-guessing," perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions.' " *Harris*, 295 Md. at 338, 455 A.2d 979 (quoting *Johnson v. State*, 292 Md. 405, 435, 439 A.2d 542 (1982) (citations omitted in original)). Through a post conviction hearing, the court has the opportunity to receive evidence and testimony and to make factual findings concerning the allegations.[8] *Id.* Development of the record would demonstrate the extent, if any, to which counsel's divided loyalty interfered with his zealous representation of appellants.

We observe that the record here is devoid of any evidence as to whether counsel disclosed to defendants a possible

---

ineffective assistance of counsel claim and the conflict of interest claim, we would be withdrawing that motion at the present time and we will be raising those issues at a Post Conviction proceeding.

8. The determination as to whether there was a conflict may involve questions of fact, *Pressley*, 220 Md. at 562, 155 A.2d 494, and mixed questions of law and fact. *Cuyler*, 446 U.S. at 342, 100 S.Ct. at 1714–15.

conflict. Thus we cannot determine whether appellants knowingly waived the conflict.[9] A post conviction proceeding would also establish whether appellants were aware of the attorneys' possible conflict and whether appellants voluntarily and knowingly agreed to proceed. As the Court said in *Gee:*

> It is ... beyond dispute that the Sixth Amendment right to counsel is breached and "effective representation is lacking ... if counsel, *unknown to the accused and without his knowledgeable assent,* is in a duplicitous position where his full talents—as a vigorous advocate having the single aim of acquittal by all means fair and honorable—are hobbled or fettered or restrained by commitment to others."

93 Md.App. at 246, 611 A.2d 1081 (citing *U.S. v. Alvarez,* 580 F.2d 1251, 1254 (5th Cir.1978) (emphasis added)).

In so concluding, we recognize that, in unusual circumstances, claims of ineffective assistance of counsel have been considered on direct appeal. In *Austin,* the Court recognized that "a claim that the constitutional right to counsel was violated because of defense counsel's conflict of interest has been treated by courts as different from a claim that the constitutional right to counsel was violated because of defense counsel's deficient performance apart from conflict of interest." 327 Md. at 394, 609 A.2d 728. Accordingly, in contrast to other claims of ineffective assistance of counsel, the Court acknowledged that conflict of interest cases may be decided on direct appeal. *Id. See also Pressley,* 220 Md. 558, 155 A.2d 494 (ineffective assistance of counsel claim based on conflict of interest decided on direct appeal); *Brown,* 10 Md.App. 215, 269 A.2d 96 (same). But careful review of the few cases that have entertained direct appeal of ineffective assistance claims makes plain that such review is not appropriate here. In those cases, either the issue of conflict was raised at trial, the conflict was egregious and patently obvious, or post conviction proceedings would not have been productive.

---

**9.** We note, however, that "certain conflicts of interest cannot be cured through disclosure or client consent." *Kent,* 337 Md. at 383–384, 653 A.2d 909.

In *Austin,* two partners in one law firm represented two defendants, Austin and Wise, in a multiple defendant drug case. At one point, the prosecutor informed the judge that Wise planned to plead guilty and testify against Austin. Because of the obvious conflict of interest, the judge ordered the two lawyers not to discuss the case with each other. When Austin failed to reach a plea agreement with the State, Austin's attorney objected to the continued gag order imposed on his law partner, but the court refused to lift it. At Austin's trial, the State called Wise as a witness, and Wise made several statements that incriminated Austin. Austin was ultimately convicted. Thereafter, the Court of Appeals granted Austin's petition for a writ of certiorari to consider "whether defense counsel labored under such a conflict of interest that the defendant's constitutional right to the assistance of counsel was violated." 327 Md. at 381, 609 A.2d 728.

The trial judge had lengthy discussions with counsel concerning conflict of interest. Although Austin's attorney never specifically objected to the firm's representation of both defendants, defense counsel objected to the gag order that prevented counsel from conferring. Also, both the trial judge and the prosecutor expressly recognized an actual conflict of interest. Thus, the Court felt that there was no need to wait for a post conviction hearing because the record clearly demonstrated the conflict. Instead, the Court was troubled by the way in which the trial court attempted to address the conflict. The Court held that "it was the action of the trial court as the result of the conflict which caused an adverse effect in defense counsel's representation." *Id.* at 394, 609 A.2d 728. The gag order impaired counsel's representation by essentially "discharg[ing] one-half of Mr. Austin's defense team. By imposing the gag order, [the judge] did not reduce the conflict; he reduced the defense team." *Id.* at 393, 609 A.2d 728.

In *Brown,* one attorney represented the defendant as well as a potential prosecution witness. The record indicated that the witness "had volunteered to the prosecution a story which completely exculpated herself by shifting all blame to the appellant." *Brown,* 10 Md.App. at 224, 269 A.2d 96. At trial,

Brown's counsel advised the court that he had a conflict and felt hampered as a result. *Id.*

In *Kent v. State,* 11 Md.App. 293, 273 A.2d 819 (1971), counsel represented two defendants. While one defendant was awaiting sentencing, he elected to testify against the other defendant who was on trial. As to the defendant awaiting sentencing, his cooperation with the State in testifying could have resulted in a favorable sentence for himself. Obviously, counsel's loyalty was divided; he did not want to jeopardize the interests of either client. Counsel needed to attack vigorously the testimony of one client in order to protect the other client who was on trial. Yet due to the conflict, counsel's cross-examination of his own client—a state's witness—was obviously restrained. Although the conflict of interest was not raised at trial, the conflict was nonetheless blatant. *Id.* at 301, 273 A.2d 819. The Court stated:

> Counsel was in an obvious conflict of interest situation. Since waiver will not be presumed from a silent record, the trial judge should have ascertained for the record whether appellant, knowingly and willingly, was consenting to the dual representation at a time when he would have been entitled to separate counsel.

*Id.* (citations omitted).[10]

In *Gee,* 93 Md.App. 240, 611 A.2d 1081, the public defender recognized that he had a conflict in his representation of two codefendants. He stated: "I can't really represent Mr. Gee effectively where he has a potential benefit if he cooperates against Mr. Coffey." *Id.* at 243, 611 A.2d 1081. Although counsel asked to withdraw his representation of the one

---

**10.** In *Att'y Grievance Comm'n v. Kent,* Judge Raker recognized that "when the testimony of one party will be detrimental to another, an attorney is in an untenable position in representing both individuals." *Id.,* 337 Md. at 380, 653 A.2d 909. *Austin* is to the same effect. There Judge Eldridge said: "[T]here is one multiple representation situation where the courts have generally taken the position that an actual conflict of interest exists. That is where an attorney ... represent[s] ... both the defendant and a codefendant (or other individual) who testifies adversely to the defendant." *Austin,* 327 Md. at 387, 609 A.2d 728.

defendant, the trial judge determined that the joint represen-
tation did not give rise to a conflict and directed the attorney
to represent both appellants.

In the foregoing cases, the issue of conflict was squarely
ripe for direct appellate review.[11]   In the instant case, howev-
er, neither appellants nor counsel voiced any objection to the
joint representation until the post trial motions were filed.[12]
Moreover, as we have noted, actual conflict has not been
established.   Therefore, we are of the view that the issue must
be fleshed out through post conviction proceedings.

## II.   Trial Court's Duty To Inquire

Pugh and Kelley assert that the trial court erred in failing,
*sua sponte*, to warn them of the hazards of joint representa-
tion.[13]   They claim that the trial court was aware of the
conflict and was obligated to inquire if appellants understood
the conflict and if they desired separate counsel.

▆ It is true that the burden of determining if a conflict
exists does not rest solely with the attorney.   If defense
counsel undertakes dual representation and fails to bring a
conflict of interest issue to the attention of the trial court, "the
court still has a great responsibility."   *Brown*, 10 Md.App. at
230, 269 A.2d 96.   Where a conflict of interest is "so immedi-

---

11.   We note that appellants have not cited any cases where, on direct
appeal, the Court has considered a conflict of interest claim that was
not, at least in some way, raised, discussed, or considered at trial.

12.   If appellants were unaware of the conflict, it is understandable that
they did not object.   Indeed, had they objected, it would fly in the face
of their assertion that they did not appreciate the untenable position in
which their attorney may have placed them.

13.   In his statement of the issues, Kelley does not explicitly raise the
issue of the trial court's failure to advise him of the conflict of interest.
But in his argument, he contends that the court had that duty.   Kelley
stated: "Of course, the question of conflict of interest and effective
assistance of counsel is for the [c]ourt to make in the record and only
after inquiring also of the defendants ... such inquiry simply did not
occur....   Notwithstanding the [c]ourt's and counsel's concerns, no
effort was made to explain ... the nature of the conflict...."

ately obvious and apparent the trial court has the responsibility, with or without objection from counsel, to protect the right of the accused from being lessened by an actual ... conflict of interest." *Id.* Thus, an apparent conflict of interest, of which the trial court "knows or reasonably should know," requires action by the trial court. *Cuyler,* 446 U.S. at 347, 100 S.Ct. at 1717. *See also Austin,* 327 Md. at 390, 609 A.2d 728 ("[I]t was apparent that an actual conflict of interest existed requiring action by the trial court."); *Graves,* 94 Md.App. at 671, 619 A.2d 123 ("When the potential conflict is brought to the attention of the court, it must conduct a full evidentiary hearing to determine if 'facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office.' "). In *United States v. Tatum,* 943 F.2d 370 (4th Cir.1991), the Court explained:

> When the risk of a conflict of interest is brought to the attention of the trial court, however, the court has the responsibility to investigate further, to advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant. In the absence of waiver the court must resolve the question as it would any issue relating to the defendant's right to counsel. "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.... The trial court should protect the right of an accused to have the assistance of counsel."

*Id.* at 379 (quoting *Holloway,* 435 U.S. at 484, 98 S.Ct. at 1179); *see also U.S. v. Akinseye,* 802 F.2d 740, 745 (4th Cir.), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1986).[14]

In this case, the court may have been aware of a possible conflict. At a motions hearing held on March 3, 1993, defense

---

**14.** We note that the Federal Rules of Criminal Procedure require courts to inform defendants of the potential hazards of joint representation and the right to separate representation. Fed.R.Crim.P. 44(c). We are unaware of an equivalent rule governing proceedings in Maryland's state courts.

counsel, arguing against the State's motion for joint trial, stated:

> These two men, Judge, are at an entirely different status with regard to the vehicle. We have got a driver who has custody and control of a vehicle. You have got another subject who is just riding. And the potential prejudice flowing to Mr. Pugh—from Mr. Pugh or to Mr. Kelley relative to the circumstances that involve the search of the vehicle are immeasurable.

The prosecutor recognized the potential conflict and brought it to the attention of the trial court. The State said:

> Okay. Well, I wonder if there is that much prejudice in trying them together, and whether they should both be represented by the same defense attorney.

The judge responded:

> It certainly appears to be, may be a problem. But that is for [counsel] to determine, not for you or me to determine.

In *Cuyler*, the Supreme Court specifically considered "whether a state trial judge must inquire into the propriety of multiple representation even though no party lodges an objection." 446 U.S. at 345, 100 S.Ct. at 1716. What the Court said in *Cuyler* is pertinent here:

> *Holloway* [*v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) ] requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense Counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances ... trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in *Holloway, supra,* at 485–486 [98 S.Ct. at 1179], trial courts necessarily rely in large measure upon the good faith and good judgment of

defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

*Id.* 446 U.S. at 346–347, 100 S.Ct. at 1717 (citations omitted).

Here, we see no basis to conclude that the trial court had an affirmative duty, based on the Sixth Amendment, to inquire or determine whether there was a conflict of interest. *Cuyler,* 446 U.S. at 347, 100 S.Ct. at 1717–18. As we have observed, joint representation "is not per se violative of constitutional guarantees of effective assistance of counsel," *Holloway,* 435 U.S. at 482, 98 S.Ct. at 1178, and there was no objection by defense counsel to the multiple representation. Moreover, the conflict, if any, was a potential one. Nor did appellants necessarily have defenses that were incompatible with each other. To the contrary, appellants' stories bolstered one another; both Pugh and Kelley denied any knowledge of the drugs in the trunk, and their explanations of how they happened to be in the vehicle were consistent and mutually reinforcing. Accordingly, we hold that, under the circumstances present in this case, there was no duty on the part of the trial court, *sua sponte,* to inquire about the propriety of joint representation.

## III. Ineffective Counsel Claims

Pugh also claims that he was denied effective assistance of counsel based on counsel's deficient performance. For reasons we have already articulated, we decline to address these claims as they are best left to a post conviction proceeding. *Harris,* 295 Md. at 337, 455 A.2d 979.

## IV. Sufficiency of Evidence

### A. *Pugh's Claim*

At trial, Pugh testified that he was not working for anyone at the time of his arrest, that he obtained the use of

the Pontiac, that he paid the costs of renting the Pontiac, and that he paid for the gas during the trip from New York to Virginia. On cross-examination, Pugh was asked, "So you were financing your own trip; isn't that right? " He responded, "Yes."

Pugh contends that this evidence was insufficient to support his "drug kingpin" conviction. Pugh claims that the evidence presented at trial did not establish that he was an "organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances." Md. Code Ann., Art. 27 § 286(g) (1992).

We hold that Pugh has failed to preserve this question for our review. Pugh made a motion for judgment of acquittal at the close of the State's case, but argued solely that the evidence did not demonstrate that he had knowledge of the cocaine hidden in the spare tire. At the close of the entire case, Pugh failed to renew his motion for judgment of acquittal; instead, the motion was renewed after the trial court instructed the jury. This motion was untimely. Md.Rule 4–324(a) (motion for judgment of acquittal may be made "at the close of all the evidence.").

In any event, in renewing the motion for judgment of acquittal, appellant based it on "the reasons previously argued at the conclusion of the State's case." Consequently, even if we were to accept the belated motion as timely made, Pugh failed to state the reasons why the evidence was lacking or which elements of the drug kingpin charge the State had failed to establish. "A claim of insufficiency of the evidence is ordinarily not preserved if the claim is not made as a part of the motion for judgment of acquittal." *Graham v. State,* 325 Md. 398, 417, 601 A.2d 131 (1992); *see also* Md.Rule 4–324 ("defendant shall state with particularity all reasons why the motion should be granted."). *Cf. von Lusch v. State,* 279 Md. 255, 263, 368 A.2d 468 (1977) (where one objecting to the admission of evidence volunteers the grounds for the objection, "he will be bound by those grounds and will ordinarily be

deemed to have waived other grounds not mentioned."); *Williams v. State,* 99 Md.App. 711, 716, 639 A.2d 180 (1994) (same).

## B. Kelley's Claim

Kelley contends that the evidence was not sufficient to support a finding that he had knowledge of the drugs that were secreted in a spare tire in the trunk of the car. He argues that the evidence established that he was asleep in the passenger seat of the car, the vehicle was rented by someone other than himself, and he had no knowledge of any drugs in the car.

The standard for our review of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Williams v. State,* 329 Md. 1, 15, 616 A.2d 1275 (1992); *McMillian v. State,* 325 Md. 272, 289–90, 600 A.2d 430 (1992). In an action tried before a jury, "it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses." *Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993). In performing this fact-finding role, the jury has authority to decide which evidence to accept and which to reject. In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts of that witness's testimony. *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,* 308 Md. 208, 517 A.2d 1105 (1986). Further, "it is the exclusive function of the jury to draw the reasonable inferences from proven facts." *McMillian,* 325 Md. at 290, 600 A.2d 430.

To establish that Kelley was guilty of possession of cocaine under Art. 27, § 287(a), the State had to prove, beyond a reasonable doubt, that Kelley had possession of the illegal

substance.[15]  Knowledge is one element of this offense.  *Dawkins v. State,* 313 Md. 638, 651, 547 A.2d 1041 (1988).  Therefore, for Kelley to have possessed the controlled substance, he must have known of the presence of the substance, and the general character or illicit nature of it.  *Id.*  Such knowledge, however, "may be proven by circumstantial evidence and by inferences drawn therefrom."  *Id.*

At trial, the prosecution established that Kelley was a passenger in a rented car stopped for a traffic violation. Trooper Lewis testified that Kelley avoided eye contact.  He also testified that Kelley offered inconsistent stories regarding why he had gone to New York and his reasons for driving to Virginia with Pugh.  Further, according to Trooper Lewis, there was no luggage in the car, and the spare tire. in the trunk was not the type typically seen in new rental cars. When he examined the tire, he discovered that it was deflated and it appeared as if someone had tampered with it.  After the trooper pulled the tire from the trunk, he noticed that it was unusually heavy.  He asked appellants whether they had had a flat tire.  Trooper Lewis testified:

> *I turned to both defendants . . . and said did you fellows have a flat tire this morning?  And Mr. Dennis Pugh immediately remarked yes, sir.*  He was shaking his head up and down, he was saying yes, sir, up in New Jersey. And Mr. Kelley was standing next to him with this—he had his hands down in his pocket, and they were looking in different directions, turning their heads real quickly, shoving their hands deep into their pockets, moving their feet back and forth.  *And Mr. Kelley shook his head up and down and was saying yes, sir, yes, sir.*  (Emphasis added).

We conclude, when viewing the evidence in the light most favorable to the State, that there was sufficient (albeit not overwhelming) evidence for a rational jury to find that Kelley had knowledge of the hidden cocaine.  In reaching our conclu-

---

**15.**  Possession is defined in § 277(s) as "the exercise of actual or constructive dominion or control over a thing by one or more persons."

sion, this Court's discussion in *Colin v. State*, 101 Md.App. 395, 646 A.2d 1095 (1994), is instructive.

In *Colin*, we found the evidence sufficient to support a passenger's conviction for possession of cocaine with intent to distribute. The passenger initially gave the trooper a false name and acted nervously as the officer searched the car. We said that "Colin's failure to be truthful to the officer and nervousness as the search progressed . . . could reasonably be interpreted as showing that he had something to hide and that he knew where it was to be found." *Id.* at 407, 646 A.2d 1095. We also said that Colin's status as a voluntary passenger created a reasonable inference that "he anticipated 'the mutual enjoyment of the contraband.'" *Id.* Similarly, in this case, the jury apparently found Kelley's testimony was not credible; the jury was entitled to conclude both appellants lied about having a flat tire. Coupled with Kelley's nervousness and the fact that he was a voluntary passenger in the car, the jury also was entitled to conclude that Kelley knew of the cocaine in the trunk.

The crime of possession with intent to distribute drugs also requires proof that the contraband was "in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance." Art. 27, § 286(a)(1). "A large quantity of cocaine in one's possession is circumstantial evidence of intent." *Colin*, 101 Md.App. at 407, 646 A.2d 1095. Further, it is not necessary to specify an amount. *Collins v. State*, 89 Md.App. 273, 279, 598 A.2d 8 (1991).

In this case, Trooper Lewis testified, as an expert in drug interdiction, that he seized approximately 3,743.7 grams of cocaine, worth approximately $508,980.00. He stated: "No one could use that for personal consumption." We conclude that this testimony was sufficient for the jury to find appellant guilty of the offense of possession with the intent to distribute cocaine, beyond a reasonable doubt.

Finally, in order to prove that Kelley was guilty of importing cocaine in excess of twenty-eight grams, the State had to

show that the amount of drugs exceeded the amount specified by statute. *Cherry v. State,* 86 Md.App. 234, 246, 586 A.2d 70 (1991). The State established, through the testimony of Trooper Lewis, that the amount of drugs in the trunk of the car far exceeded the statutory amount. Accordingly, the evidence was sufficient to sustain Kelley's conviction.

## V. Pugh's Constitutional Right to be Present at a Critical Stage of the Proceeding

Pugh contends that he was denied his constitutional right to be present at the hearing on the State's motion to strike the defense suppression motion. According to Md.Rule 4–231(b), "A defendant is entitled to be present at a preliminary hearing and every stage of the trial...." This right is a common law right preserved by both the Sixth Amendment of the United States Constitution and Article 5 of the Maryland Declaration of Rights. *Lewis v. State,* 91 Md.App. 763, 769, 605 A.2d 988 (1992); *see also Miles v. State,* 88 Md.App. 360, 370, 594 A.2d 1208, *cert. denied* 325 Md. 94, 599 A.2d 447 (1991).

It is firmly established, however, that the right to be present may be waived by a defendant who is voluntarily absent after the proceeding has commenced, or "who, personally, or through counsel, agrees to or acquiesces in being absent." Md.Rule 4–231(c). *See also Henry v. State,* 324 Md. 204, 223, 596 A.2d 1024, *cert. denied* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1991); *Lewis,* 91 Md.App. at 769, 605 A.2d 988. In *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981), the Court explained:

> With respect to all criminal trials or parts of trials ... an effective waiver of the defendant's right to be present at every stage of the trial will not always require a personal waiver by the defendant. Where the right of confrontation is not implicated, and where there is involved no other right requiring intelligent and knowing action by the defendant himself for an effective waiver, a defendant will ordinarily be bound by the action or inaction of his attorney.

\* \* \* \* \* \*

[I]f the defendant himself does not affirmatively ask to be present at such occurrences or does not express an objection at the time, and if his attorney consents to his absence or says nothing regarding the matter, the right to be present will be deemed to have been waived.

*Id.* at 219–220, 438 A.2d 1301.

■ In the case *sub judice*, immediately after the trial court granted the State's motion to strike, the prosecutor observed: "Your Honor, it just occurred to me that neither of the defendants—the Defendant was not present during that entire argument.... They are both out in the hallway." Defendant's counsel responded: "Your Honor, they are fully aware of the circumstances." Accordingly, as counsel may, through acquiescence, waive defendant's right to be present, Pugh's claim of reversible error must fail. *See Henry,* 324 Md. at 224, 596 A.2d 1024 (defendant's counsel may, through acquiescence, waive the defendant's right to be present).

## VI. Motion to Strike the Motion to Suppress

■ Pugh contends that the trial court erroneously granted the State's motion to strike his motion to suppress on the ground that the suppression motion was untimely. Although Pugh conceded that the motion was filed beyond the time allowed by Md.Rule 4–252(a), he claims that the court should have found good cause to excuse the untimely filing. He further suggests that, because the delay was not excessive, the State was not unfairly prejudiced, and he should not be punished for his attorney's delinquency.

■ Md.Rule 4–252(b) provides that a motion to exclude evidence resulting from an unlawful search and seizure "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213(c)...." *See Davis v. State,* 100 Md.App. 369, 384–85, 641 A.2d 941 (1994). If such a motion is not raised in conformity with the rule, the motion is waived "unless the court, for good cause shown, orders otherwise." Md.Rule 4–252(a). Defendant has the burden to show good cause. *Davis,* 100 Md.App. at 385, 641 A.2d 941; *Allen*

*v. State,* 91 Md.App. 775, 779–80, 605 A.2d 994, *cert. denied,* 328 Md. 92, 612 A.2d 1315 (1992). Further, "[f]ailure to make a mandatory motion within the prescribed time limits, absent good cause to forgive the dereliction, bars all claims, even those full of constitutional merit." *Davis,* 100 Md.App. at 385, 641 A.2d 941.

In *Grandison v. State,* 305 Md. 685, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174, *reh'g denied,* 479 U.S. 1001, 107 S.Ct. 611, 93 L.Ed.2d 609 (1986), the Court explained that "a statutory requirement of 'good cause' vests the trial court with wide discretion. . . . Thus the trial judge's determination is entitled to the utmost respect and should not be overturned unless there was a clear abuse of that discretion." *Id.* 305 Md. at 711, 506 A.2d 580 (citing *State v. Frazier,* 298 Md. 422, 470 A.2d 1269 (1984) (analysis of "good cause" in context of postponement of jury trial date), *State v. Jones,* 270 Md. 388, 312 A.2d 281 (1973) (discussing "good cause" requirement to permit requested withdrawal of an accused's jury trial waiver), and *Madore v. Baltimore Co.,* 34 Md.App. 340, 346, 367 A.2d 54 (1976)).

Pugh initially appeared before the court on August 18, 1992. On November 10, 1992, defendant's local counsel entered his appearance and the court granted the defense motion for continuance. Pugh's motion to suppress was not filed until November 13, 1992. Accordingly, Pugh was entitled to submit his untimely motion to suppress only upon a showing of "good cause." In defense of the untimely motion, Pugh's local counsel argued that the delay was substantially less than the almost two year delay present in *Allen.* Additionally, counsel argued that Pugh's out-of-state counsel "had a very hectic schedule," and that it was difficult for defendants to "get together ... funds to retain counsel, get ... counsel to coordinate with local counsel, get that counsel admitted and make ... motions within thirty days." The court ruled:

Less than two months—or two months pales in comparison to two years, but two months is a lengthy period of time. We are not talking about a day or two.

＊　　＊　　＊　　＊　　＊　　＊

I can't overlook the fact that there was representation by the same parties in District Court. And the two months I do find to be a lengthy period of time. The fact that the attorneys involved had busy schedules, I don't find to be a good cause to go outside the rules, so I will grant the Motion to Strike the Motion to Suppress.

On review, we cannot substitute our judgment for that of the trial court, even if we might have reached a different result. The trial court did not abuse its discretion in granting the State's Motion to Strike or in finding that good cause had not been established.[16]

## VII. Court's Instruction to Jury

Kelley contends that the court failed to instruct the jury that, "without being convinced beyond a reasonable doubt that defendant, Morgan Kelley, had knowledge of the narcotics secreted in the spare tire in the trunk of the car, the jury could not convict him of any charges being brought." We are of the view that the court properly instructed as to knowledge.

Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

In this case, the court specifically explained the elements as

---

16. We observe that the State's case depends largely on the drugs discovered during the alleged consensual search of the trunk. In the context of this case, a motion to suppress the search may have been important. The issue of whether counsel was ineffective for failing to file a timely motion to suppress has been raised by Pugh as an issue on appeal, but we have said that it is best left to the post conviction court. We decline to speculate on the merits of such a motion.

follows: [17]

> The Defendant is charged with the crime of possession of cocaine, which is a controlled dangerous substance.

> In order to convict the Defendant of possession of cocaine, *the State must prove, number one, that the Defendant knowingly possessed the substance;* number two, that the Defendant knew of the general character or illicit nature of the substance; and number three, that the substance was cocaine.

> Possession means having control over a thing, whether actual or indirect. The defendant does not have to be the only person in possession of the substance. More than one person may have possession of the same substance at the same time. A person not in actual possession who knowingly has both the power and the intention to exercise control over a thing, either personally or through another person, has indirect possession.

> In determining whether the Defendant had indirect possession of the substance, consider all of the surrounding circumstances. These circumstances include the distance between the Defendant and the substance, whether the Defendant had some ownership or possessory interest in the place or automobile where the substance was found, and any

---

**17.** After the court instructed the jury, defense counsel noted an exception to the instructions. He explained that "the defense had offered a number of instructions which [they] felt adequately described the law as [they] view it ... with regard to the requisite element of proving possession and the knowledge aspect." Defense counsel offered the following instructions:

> 1. You may not find the defendant guilty of the crime of possession of a narcotic drug unless you have been convinced by the prosecution, beyond a reasonable doubt, that he had knowledge of the presence of the drugs and that he exercised dominion and control over them, and that he had accessible and exclusive possession thereof.
>
> 2. You are instructed that you may not infer that the defendant possessed a narcotic drug from the mere presence of such drug in a motor vehicle in which he was a passenger or occupant jointly with another person. You must find him not guilty of the charge in the absence of proof beyond a reasonable doubt of his actual knowledge of the presence of the drugs and his control over them.

indications that the Defendant was participating with others in the mutual use and enjoyment of the substance. (Emphasis added).

Further, the trial court explained the State's burden of proof:

The Defendant is presumed to be innocent of the charges. This presumption remains with the Defendant throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the Defendant is guilty.

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt. This burden remains on the State throughout the trial.

The instruction given by the court was identical to the pattern jury instruction for the offense of possession of a controlled dangerous substance. *See Maryland Criminal Pattern Jury Instruction* 4:24 (1991). It also conformed to the definition in *Dawkins,* 313 Md. at 651, 547 A.2d 1041 ("The accused, in order to be found guilty, must know of both the presence and the general character or illicit nature of the substance."). Accordingly, the court's instruction in the case *sub judice* "fairly covered" the necessary elements of drug possession; the court did not err in refusing to grant appellant's precise instruction. *See Tirado v. State,* 95 Md.App. 536, 558–60, 622 A.2d 187, *cert. denied,* 331 Md. 481, 628 A.2d 1067 (1993); *Harris v. State,* 11 Md.App. 658, 664, 276 A.2d 406, *cert. denied,* 262 Md. 747 (1971).

**JUDGMENTS AFFIRMED; APPELLANTS TO PAY COSTS.**